[No. F029033. Fifth Dist. Aug. 4, 1998.]

F & L FARM COMPANY et al., Plaintiffs and Respondents, v. CITY COUNCIL OF THE CITY OF LINDSAY, Defendant and Appellant.

COUNSEL

McCormick, Kabot, Foley, Jenner & Watson and S. L. Kabot for Defendant and Appellant.

Williams, Jordan & Brodersen and Steven R. Williams for Plaintiffs and Respondents.

OPINION

VARTABEDIAN, Acting P. J.—When a city in California has deprived California residents of constitutionally protected property interests and a judgment has been entered against it to compensate the residents for the wrongs committed, may the city simply refuse to pay the judgment on the basis that it has no spare money? We think not. Accordingly, we affirm the judgment entered below, which ordered issuance of a peremptory writ of mandate to compel payment of the judgment.

*Facts and Procedural History*

The City Council of the City of Lindsay, the present appellant (hereafter the city), for many years accepted saline industrial waste from a local enterprise known as Lindsay Olive Growers. The city placed this waste water into percolation ponds and, in subsequent years, into lined evaporation ponds. Much of the salt from the waste water percolated into the ground through the original ponds and through holes in the liners of the later ponds. The salt eventually entered the groundwater and caused injury to farms in the vicinity of the ponds. The injury consisted primarily of lost profits from crops and permanent reduction of the value of the land comprising the farms.

Three farm owners recovered judgments against the city in May of 1991, compensating them under California Constitution, article I, section 19,[1] on an inverse condemnation theory, for their losses caused by the city's pollution of the groundwater. We affirmed these judgments in an unpublished opinion filed January 10, 1996, in *F & L Farm Co.* v. *City of Lindsay* (No. F016555), of which we take judicial notice. On February 27, 1997, the trial court entered a nunc pro tunc amended judgment on behalf of each of the farm owners (we sometimes refer to the owners collectively as respondents).[2] The judgments totaled $2,564,009 plus interest in damages, and $478,928.30 in costs and attorney fees. The city asserts that, with accrued interest, the total owed to respondents now exceeds $5 million.

The city has never paid anything toward the satisfaction of the judgments against it. On April 11, 1997, respondents filed a petition for writ of mandate to compel the city to pay the judgments. The city answered the petition, contending that payment of the judgments "would result in undue hardship to [the city] and its citizens" and that the city "lacks the authority to impose taxes, assessments and/or rates and charges sufficient to pay the judgment with interest thereon without first obtaining voter and/or land owner approval pursuant to Articles XIIIC and XIIID of the California Constitution." Various declarations submitted by the city attested to its lack of funds and its "fragile" economy.

On June 25, 1997, the court entered judgment for the farm owners. It ordered issuance of a peremptory writ of mandate commanding the city to

---

[1]All further references to roman-numeraled articles are to the California Constitution. Article I, section 19 provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."

The farm owners did not rely in the court below on the "takings" clause of the Fifth Amendment to the United States Constitution. That provision, made applicable to the states by the Fourteenth Amendment, provides for similar but somewhat narrower protection against governmental takings. (*Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1, 9, fn. 4 [8 Cal.4th 440b, 32 Cal.Rptr.2d 244, 876 P.2d 1043].)

[2]The city rather obscurely contends the underlying judgments were not "final" until the entry of the nunc pro tunc judgments in 1997. In our view, the underlying judgments were final, for purposes of the city's duty to pay the judgments or post an undertaking pending the determination of the appeal, in 1991. (See *Luce* v. *Clear Lake Water Co.* (1968) 266 Cal.App.2d 123, 124 [71 Cal.Rptr. 665].) Since the judgments were not paid upon our affirmance of them in case No. F016555, we assume there was no undertaking or bond posted to stay enforcement of the judgments in 1991. We do not find this question determinative of this appeal, but we do note that the city has avoided dealing with these judgments for the better part of this decade.

pay the judgments "in accordance with Government Code Section 970.4, the [city] having failed to request to pay the judgments in installments pursuant to Government Code Section 970.6."[3] The peremptory writ was issued on June 25, 1997. The city's motions for a new trial and for entry of a new and different judgment were denied on July 22, 1997. The city filed a timely notice of appeal.

## Discussion

■ The city recognizes that it owes respondents money pursuant to the judgments. It acknowledges that the relevant Government Code sections

---

[3]Neither the judgment nor the writ ordered payment "from funds available during the 1996-97 fiscal year" as the city repeatedly asserts in its brief. Although the order for payment "in accordance with Government Code Section 970.4" was a rather shorthand reference to the process involved, the trial court's directions clearly pointed the way for the city.

Government Code section 970.2 provides, in part: "A local public entity shall pay any judgment in the manner provided in this article [composed of §§ 970-971.2 of the Gov. Code]." Government Code section 970.8, subdivision (a) establishes the city's first step in discharging this fundamental duty; it provides: "Each local public entity shall in each fiscal year include in its budget a provision to provide funds in an amount sufficient to pay all judgments in accordance with this article." Government Code section 970.4 then requires that the money budgeted in accordance with this duty be paid to the judgment creditors; it provides:

"Except as provided in Section 970.6, the governing body of a local public entity shall pay, to the extent funds are available in the fiscal year in which it becomes final, any judgment, with interest thereon, out of any funds to the credit of the local public entity that are:

"(a) Unappropriated for any other purpose unless the use of such funds is restricted by law or contract to other purposes; or

"(b) Appropriated for the current fiscal year for the payment of judgments and not previously encumbered."

Government Code section 970.6, to which the trial court also referred, provides:

"(a) The court which enters the judgment shall order that the governing body pay the judgment, with interest thereon, in not exceeding 10 equal annual installments if both of the following conditions are satisfied:

"(1) The governing body of the local public entity has adopted an ordinance or resolution finding that an unreasonable hardship will result unless the judgment is paid in installments.

"(2) The court, after hearing, has found that payment of the judgment in installments as ordered by the court is necessary to avoid an unreasonable hardship.

"(b) Each installment payment shall be of an equal amount, consisting of a portion of the principal of the judgment and the unpaid interest on the judgment to the date of the payment. The local public entity, in its discretion, may prepay any one or more installments or any part of an installment."

Although Government Code section 970.6 seems to contemplate that the required showing for installment payments be made in the trial court at the time of the original judgment, respondents offered the city the option to resolve the mandate proceedings by means of an order for installment payments. (Cf. *Community Redevelopment Agency* v. *Force Electronics* (1997) 55 Cal.App.4th 622, 632 [64 Cal.Rptr.2d 209] [nonconsensual installment payments not permitted under the circumstances].)

impose upon it a duty to pay the judgments.[4] The city contends, however, that articles XIII A, XIII B, XIII C and XVI so limit its ability to tax and spend as to override its statutory duty to pay the underlying judgments. Accordingly, the city argues, the "impossibility" of generating income to pay the judgments renders relief by writ of mandate inappropriate, notwithstanding Government Code section 970.2.[5]

In making its argument, the city gives far too little consideration to the constitutional requirement for compensation that is the basis of the underlying judgments against it. In fact, the city ignores this facet of the case altogether: Article I, section 19, is not cited, much less discussed, in either of the city's briefs filed in this court. Properly considered in light of well-established canons of constitutional interpretation, the constitutional provisions upon which the city relies do not relieve the city of the duty to pay the judgments.

As established in our previous opinion in case No. F016555, the city's action and inaction with respect to pollution of respondents' groundwater constituted "taking or damage" of respondents' property for purposes of article I, section 19. As such, the judgments are appropriately characterized as "inverse condemnation" judgments. (See *Bunch* v. *Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 435-436 [63 Cal.Rptr.2d 89, 935 P.2d 796].)

Both inverse condemnation awards and constitutional limitations on government spending have a long history in this state. In a brief historical digression, we will examine both.[6]

In *Reardon* v. *San Francisco* (1885) 66 Cal. 492 [6 P. 317], the first reported inverse condemnation case in California, the court stated: "We are of [the] opinion that the right assured to the owner by this provision of the constitution is not restricted to the case where he is entitled to recover as for

---

[4]Government Code section 970.2 provides, in part: "A writ of mandate is an appropriate remedy to compel a local public entity to perform any act required by this article."

[5]Unfortunately for respondents, of course, the city cannot *return* respondents' property to them as can an insolvent government agency that has affirmatively instituted eminent domain proceedings. (See *Community Redevelopment Agency* v. *Force Electronics, supra,* 55 Cal.App.4th at p. 632.) Here, respondents get money or they get nothing at all. Further, it would appear that respondents recover through the writ of mandate process or not at all: A judgment against a local public entity is not enforceable as an ordinary money judgment under the Code of Civil Procedure. (Gov. Code, § 970.1, subd. (b).)

[6]Unforeseen liability on the part of California cities also has a long history. In *City of Long Beach* v. *Lisenby* (1919) 180 Cal. 52 [179 P. 198], the city had built a convention center and auditorium. Part of the structure collapsed, killing and injuring many persons. Judgments were obtained against the city in "a sum much in excess of the income and revenue of said city provided for any single year." (*Id.* at p. 54.)

a tort at common law. If he is consequently damaged by the work done, whether it is done carefully and with skill or not, he is still entitled to compensation for such damage under this provision." (*Id.* at p. 505.) As the *Reardon* court noted, the current provision requiring compensation when private property is "taken or damaged for public use" was adopted in its current form as an original part of the Constitution of 1879. (*Reardon v. San Francisco, supra,* 66 Cal. at p. 501.)

Similarly, article XI, former section 18, was also adopted in 1879; it provided: " 'No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, . . .' " (*Mahoney v. San Francisco* (1927) 201 Cal. 248, 251-252 [257 P. 49].) This same debt limitation is carried over, with certain additions, in the present article XVI, section 18. This constitutional limitation is one of those upon which the city relies for the proposition that it cannot pay the judgments underlying this action.[7]

Despite the constitutional debt limitation, the courts held from an early date that *involuntary* obligations of the local government entity were not affected by the constitutional limitation. (See, e.g., *City of Long Beach v. Lisenby, supra,* 180 Cal. at p. 58; *Metropolitan Life Ins. Co. v. Deasy* (1919) 41 Cal.App. 667, 670 [183 P. 243].) Thus, in *Oscar Heyman & Brother v. Bath* (1922) 58 Cal.App. 499 [208 P. 981] the petitioner sought a writ of mandate to force San Francisco to "levy and collect[] . . . a tax sufficient to pay a judgment which the petitioner holds against the said city and county." (*Id.* at p. 499.) The petitioner had paid a tax under protest and had obtained a judgment determining the tax was illegal and that the city had to repay it. (*Ibid.*) San Francisco demurred, contending that it had no money and could not raise any because of the debt limitation provisions of article XI, former section 18, as then constituted. (58 Cal.App. at p. 500.) The court pointed out that this section of the Constitution "has been interpreted as applying only to actions *ex contracto* and not to actions *ex delicto* or to obligations directly imposed by statute such as salaries of public officers." (*Ibid.*) The court concluded: "We are satisfied that the payment of the tax involved here was involuntary and that the judgment is evidence of an obligation imposed by law . . . . Such being the case, the city is not asked to 'incur' an indebtedness in excess of its income and revenue, but is asked to provide the

---

[7]The city mistakenly asserts that this debt limitation is of recent origin and requires reevaluation of the statutory mechanisms by which cities can pay judgments. In fact, the constitutional debt limitation long preceded the enactment of Government Code section 970 et seq. in 1963. (See Stats. 1963, ch. 1715, §§ 3-4, pp. 3389-3394.)

necessary income and revenue sufficient to meet an indebtedness imposed upon it by law." (*Ibid.*)

Based on this brief detour into the historical spending limits on local governments, article XVI, section 18, upon which the city relies in part, is inapplicable to prevent judicial enforcement by writ of mandate of a judgment imposing inverse condemnation liability: A judgment imposed on a local government entity by direct operation of the Constitution, in this case article I, section 19, clearly is an "obligation imposed by law." (Cf. Gov. Code, § 971 [statutory limits on taxes and obligations inapplicable to " '[j]udgment[s] resulting from a nondiscretionary act' . . . includ[ing] a judgment founded upon tort or inverse condemnation liability"].) Accordingly, cases cited by the city, such as *Goldsmith* v. *San Francisco* (1896) 115 Cal. 36 [46 P. 816] and *Barkley* v. *City of Blue Lake* (1996) 47 Cal.App.4th 309 [54 Cal.Rptr.2d 679], which deal with judgments entered on *contractual* obligations of local governments, are wholly inapplicable.

By contrast with the cases addressing the debt limitations of article XVI, section 18, there is no comparable body of law clearly establishing that the limitations on local taxing and spending contained in articles XIII A, XIII B and XIII C are inapplicable to involuntary debts incurred by local governments. (These articles were added to the Constitution by initiative in 1978, 1979 and 1996, respectively; we will refer to them as the "initiative limitations.") The city contends these constitutional provisions immunize it from a writ of mandate compelling it to satisfy respondents' underlying judgments.

The city fails to offer any reasoned argument or analysis concerning the applicability of the initiative limitations in the context of constitutionally based inverse condemnation awards. As such, we might well deem this issue waived. (See *Ellenberger* v. *Espinosa* (1994) 30 Cal.App.4th 943, 948 [36 Cal.Rptr.2d 360]; *Eureka Teachers Assn.* v. *Board of Education* (1988) 199 Cal.App.3d 353, 369 [244 Cal.Rptr. 240].) Nevertheless, in deference to the taxpayers of the city, a discussion of the issues is warranted.

The initiative limitations provide in various ways for curbs on the taxing and spending powers of various governments, including cities. In construing these provisions, we are guided by well-established canons of interpretation. First, a constitutional or statutory provision will not be construed so as to violate the federal Constitution unless such construction is absolutely necessary. Second, all parts of a constitution or statute are to be construed to give all sections effect if possible: An implied repeal of an earlier provision by adoption of a subsequent provision is not a favored construction. These canons of interpretation lead to the conclusion that the inverse condemnation exception to article XVI, section 18 also applies to initiative limitations.

The supremacy clause of the federal Constitution provides: "This Constitution . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) While the California Constitution's requirement for compensation in inverse condemnation actions is "somewhat broader" in some instances than the requirements of the Fifth Amendment to the United States Constitution (*Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 298 [142 Cal.Rptr. 429, 572 P.2d 43]), the requirements of the two generally overlap (see *Tilem* v. *City of Los Angeles* (1983) 142 Cal.App.3d 694, 701-702 [191 Cal.Rptr. 229]). Accordingly, any judicial construction of the initiative limitations that prevented payment of inverse condemnation judgments would conflict, in the large majority of cases, with the Fifth Amendment to the United States Constitution and would violate the supremacy clause. (See *Howlett* v. *Rose* (1990) 496 U.S. 356 [110 S.Ct. 2430, 110 L.Ed.2d 332]; cf. *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 796, fn. 6 [214 Cal.Rptr. 904, 700 P.2d 794].)

■ "Where a statute [or state constitutional provision[8]] is susceptible of several interpretations, one of which raises serious constitutional problems, we will construe the statute, if possible, to avoid those problems. (See *DeBartolo Corp.* v. *Fla. Gulf Coast Trades Council* (1988) 485 U.S. 568, 575 . . . ." (*Conway* v. *Pasadena Humane Society* (1996) 45 Cal.App.4th 163, 177 [52 Cal.Rptr.2d 777]; see *Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 657 [47 Cal.Rptr.2d 108, 905 P.2d 1248].) Construction of the initiative limitations to carry forward the inverse condemnation exception applicable to article XVI, section 18, avoids the obvious likelihood that the initiative limitations would otherwise run afoul of the Fifth Amendment to the United States Constitution in the context of inverse condemnation judgments. (See *Heimann* v. *City of Los Angeles* (1947) 30 Cal.2d 746, 753 [185 P.2d 597] [allowing costs, pursuant to art. I, § 14 (now § 19) in inverse condemnation action even though statute disallowed costs if recovery was less than superior court jurisdictional limit].)

■ Secondly, " 'the law shuns repeals by implication . . . .' [Citation.] Indeed, '[s]o strong is the presumption against implied repeals that when a new enactment conflicts with an existing provision, "[i]n order for the second law to repeal or supersede the first, the former must constitute a

---

[8]"We note preliminarily that although we are examining a provision which, by its enactment by ballot, has been accorded state constitutional stature, the supremacy clause of the United States Constitution nevertheless compels that section 26, like any other state law, conform to federal constitutional standards before it may be enforced against persons who are entitled to protection under that Constitution." (*Mulkey* v. *Reitman* (1936) 64 Cal.2d 529, 533 [50 Cal.Rptr. 881, 413 P.2d 825], affd. *sub nom. Reitman* v. *Mulkey* (1967) 387 U.S. 369 [87 S.Ct. 1627, 18 L.Ed.2d 830].)

revision of the entire subject, so that the court may say that it was intended to be a substitute for the first." ' [Citations.] Thus, to avoid repeals by implication 'we are bound to harmonize . . . constitutional provisions' that are claimed to stand in conflict." (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization* (1991) 53 Cal.3d 245, 249-250 [279 Cal.Rptr. 325, 806 P.2d 1360]; see also *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 60-61 [233 Cal.Rptr. 38, 729 P.2d 202].)

As the city acknowledges, ". . . the language of the constitutional amendments themselves and the 'legislative history' of the various initiative measures does not give any indication whatsoever that there was any thought or consideration given to the potential impact of these initiatives on the subject matter at hand," that is, payment of inverse condemnation judgments. "To the contrary, the arguments in favor of Proposition 13 [which enacted article XIII A] adopt a populist theme that cannot easily be reconciled with [the city's] interpretation of the measure. Proponents of Proposition 13 described the measure as directed against 'spendthrift politicians' and as '[r]estor[ing] government of, for and by the people.' [Citation.]" (*Kennedy Wholesale, Inc.* v. *State Bd. of Equalization, supra,* 53 Cal.3d at p. 250.) The entire context of modern "takings" theory shares this same populist, antigovernment philosophical base. (See, e.g., *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 321 [107 S.Ct. 2378, 2389, 96 L.Ed.2d 250]; Berger, *Happy Birthday, Constitution: The Supreme Court Establishes New Ground Rules for Land-Use Planning* (1988) 20 Urb. Law 735.) We cannot rationally conclude that the voters, in enacting the initiative limitations on "big government," intended to empower these same governments to damage private property with impunity and without effective means of compelling the payment of just compensation to injured citizens.

Article XIII C, section 2, begins with the phrase, "Notwithstanding any other provision of this Constitution . . ." before requiring a two-thirds vote of the electorate to raise funds "for specific purposes" by means of a "special tax." In keeping with the long-standing interpretation of article XVI, section 18, and its predecessors, we conclude that "specific purposes" must be read to mean "specific purposes of the local government"—in other words, not the discharge of a duty imposed by law.

A similar limiting construction of article XIII B, section 6, was adopted by the Supreme Court in *County of Los Angeles* v. *State of California, supra,* 43 Cal.3d at page 56. In that case, the question was whether a general increase in workers' compensation benefits payable by all employers, also payable by local governments to their injured workers, constituted a "higher level of service" under an existing "program" mandated by the state. If so, article

XIII B, section 6, would require the state to reimburse local governments for their increased costs. (43 Cal.3d at pp. 49-50.)

The court determined that, in the absence of any countervailing indication in the history of the initiative adopting article XIII B, "the electorate had in mind the commonly understood meanings of the term ['program'] . . . ." (43 Cal.3d at p. 56.) If the term was used in "such a unique fashion" (*id.* at p. 57) as to include any legislation that increased the costs of local government, "the result would be far-reaching indeed" (*ibid.*). Where "no such intent is reflected in the language or history of article XIII B or section 6," such an interpretation would be unreasonable. (*Ibid.*)

In the present case, we think a construction of the term "specific purpose" to include the payment of any debt of the local government, no matter what the source or nature of the debt, would give to the phrase "specific purpose" a unique meaning the voters could not possibly have intended. Such a meaning would ignore both the long-standing interpretation of constitutional debt/taxation limitations in the context of article XVI, section 18, as well as the primacy of the "just compensation" requirement of the state and federal Constitutions. ▮ Thus, we conclude payment of a judgment imposed in an inverse condemnation case does not implement a municipal "purpose" within the meaning of article XIII C. Rather, such payment acts solely to vindicate the constitutional rights of the landowner.

We conclude the assessment of a tax levy is not rendered "impossible," as the city urges, by the initiative limitations or by article XVI, section 18. The trial court correctly ordered the city to pay the judgments in accordance with governing law.

*Disposition*

The judgment is affirmed. Respondents are awarded their costs on appeal.

Thaxter, J., and Levy, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 21, 1998.