**In re GENERAL TEAMSTERS, WAREHOUSEMEN AND HELPERS UNION LOCAL 890, Debtor.**

**Bankruptcy No. 590–03823–ASW.**

United States Bankruptcy Court, N.D. California, San Jose Division.

Sept. 29, 1998.

John T. Hansen, Nossaman, Guthner, Knox & Elliott, San Francisco, CA, for Debtor.

David G. Finkle, David G. Finkle & Associates, Los Angeles, CA, for Creditor.

## MEMORANDUM DECISION OVERRULING OBJECTION TO CONFIRMATION AND CONFIRMING DEBTOR'S PLAN

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Before the Court is the Third Amended Plan of Reorganization ("Plan"), proposed for confirmation by the Debtor above-named ("Debtor") in this Chapter 11 case. Debtor is a local labor union, affiliated with the International Brotherhood of Teamsters ("IBT") and the Teamsters Joint Council No. 7 ("JC7").

An objection to confirmation has been filed by a group consisting of: Security Farms; El Dorado Farms; H.Y. Minami and Sons; Manriquez & Acuna, Inc.; Higashi Farms, Inc.; Pisoni Farms; Joe Freitas & Sons; Freitas Farms; San Ysidro Farms; and J.J.C., Inc. (collectively, "Creditor").[1]

Debtor is represented by John T. Hansen, Esq. and Elaine M. O'Neil, Esq. of Nossaman, Guthner, Knox & Elliott. Creditor is represented by David G. Finkle, Esq. of Finkle & Stoll. The matter has been submitted for decision after trial and post-trial briefing.

At trial, Debtor called the following witnesses:

Franklin L. Gallegos ("Gallegos"), President of Debtor since 1985.

Michael A. Johnston ("Johnston"), a business representative of Debtor since 1988 and an administrative assistant to Gallegos.

Ken S. Mee ("Mee"), an International Vice President of IBT since February 1, 1992.

Chuck Mack ("Mack"), President of JC7 for twelve years and Secretary/Treasurer of Teamsters Local 70 for twenty-three years.

---

1. An objection to confirmation was also filed by National Union Fire Insurance Company but has been withdrawn.

Edward P. Clark ("Clark"), a Certified Public Accountant with the firm of Hilderbrand and Clark.

Frank O. May ("May"), a real estate appraiser.

Donald H. Wollett ("Wollett"), an attorney and professor familiar with the history and background of labor matters in America.

Creditor called no witnesses at trial.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### BACKGROUND

Debtor filed a Chapter 11 petition on August 13, 1990.[2]

Creditor asserts an unsecured claim based on a judgment for $526,692 by the United States District Court for the Northern District of California. Such judgment finds Debtor liable for damage suffered by Creditor as a result of violence by Debtors' members during a 1989 strike that occurred prior to commencement of this Chapter 11 case.[3]

Debtor's Plan proposes that Debtor will distribute to creditors holding allowed claims against the bankruptcy estate, in accordance with the priorities established by the Bankruptcy Code, an amount equal to the equity in the estate's real property and tangible personal property. Debtor proposes to borrow and contribute to the Plan a sum of money equal to the equity, at fair market value, in its real property at time of confirmation plus the fair market value of its unencumbered office equipment and vehicles; any gain realized by Debtor through sale or refinance of assets during the five years post-confirmation is also to be distributed to unsecured creditors. In its post-trial brief, Debtor estimates that the Plan would permit a dividend of some 31% to be paid on unsecured claims such as that held by Creditor. The Plan has been accepted by all classes except Class 2.3B, which includes Creditor's claim and that class voted to reject the Plan.

Debtor's income consists of monthly dues and initiation fees received from Debtor's members. Debtor remits a percentage of dues each month to IBT and JC7 in the form of "per capita tax" payments. Debtor contends that, after making such payments to IBT and JC7, Debtor's remaining income is sufficient only to cover monthly operating expenses on a "break even" basis.

Creditor urges that Debtor's Plan should provide for an increase in membership dues and/or temporary reduction or cessation of per capita tax payments for a period of time (or elimination of such obligations altogether, by termination of Debtor's affiliation with IBT and JC7), so as to leave Debtor with sufficient income after payment of monthly operating expenses to produce a larger dividend to unsecured creditors. Creditor argues that the failure of the Plan to include such provisions renders it unconfirmable—while Creditor's pleadings do not clearly set forth the statutory grounds upon which Creditor relies, the Court construes the objection as follows:

1/ The Plan has not been proposed in good faith, which is a prerequisite to confirmation pursuant to 11 U.S.C. § 1129(a)(3).

2/ The Plan does not propose to pay Creditor at least as much as Creditor would receive if Debtor were liquidated under Chapter 7, which is a prerequisite to confirmation pursuant to 11 U.S.C. § 1129(a)(7)(A)(ii).

3/ The Plan is not "fair and equitable" to Creditor within the meaning of 11 U.S.C. § 1129(b)(1), inasmuch as it violates the Absolute Priority Rule of 11 U.S.C. § 1129(b)(2)(B)(ii).

---

**2.** This case was commenced prior to October 22, 1994, the effective date of the amendments to Title 11, United States Code ("the Bankruptcy Code") enacted in 1994; all references to Title 11 are to that statute as it provided prior to such amendments.

**3.** In that action, Creditor also named IBT and JC7 as defendants, but the District Court granted summary judgment in favor of IBT and JC7 by an order of June 16, 1994, finding that neither affiliate was proven to have "participated in or authorized the conduct which is the subject of" Creditor's complaint.

## II.

### FACTS

#### A. Debtor's Representation Of Its Members

Wollett testified concerning the development, purpose, and function of labor law in America, which is governed by the National Labor Relations Act, 29 U.S.C. Under federal labor law, employees of a company or within an industry have the right to organize, and to create a bargaining unit to influence their working conditions. The members of such a unit may vote to choose a representative to negotiate with the employer on behalf of the employees, which representative is often a local labor union such as Debtor. A local union that is elected to represent a bargaining unit is responsible to its members for negotiation and formation of a collective bargaining agreement ("CBA") between the employees and the employer, and the maintenance of such CBA throughout its term by monitoring and policing it, including the establishment and enforcement of grievance procedures to prevent or halt breaches of the CBA by the employer.

Johnston testified credibly that, in performing its duties to its members, Debtor has historically been able to operate only on a "break even" basis; in 1995, income and expenses both totalled approximately $2.3 million. He prepared projections for the next five years based on Debtor's audited financial statements for the period from 1985 through 1993, showing that the same conditions can be expected in future.[4] Johnston said that, by "breaking even", he meant that Debtor might have a small surplus (*e.g.*, $50,-000 or less) one year that would be absorbed by shortages of similar amounts in other years; Debtor's usual approach to temporary shortages has been to defer payment of bills. Johnston testified that, since the 1989 strike, Debtor had incurred an average of $80,000 to $90,000 per year in legal expenses, of which approximately $200,000 had been devoted to bankruptcy matters. Johnston's projections

assume a 1% to 2% growth rate for membership and modest membership wage increases, based on historical experience; they also contemplate borrowing $50,000 as part of the loan proposed by the Plan, to provide a reserve for timely payment of expenses and avoid temporary shortages—Johnston described the proposed $50,000 loan as a "slim reserve" (approximately one week's expenses), but said that Debtor was "used to working on a slim reserve". Johnston also compared Debtor's staff levels with those of other local unions and found that Debtor maintains lower levels; for example, Teamsters Local 70, of which Mack is Secretary/Treasurer, has one employee for every 200 members, whereas Debtor has one employee for every 450 members. Johnston pointed out that, since most of Debtor's membership consists of farmworkers who are employed seasonally, and since dues are based on wages received, Debtor is in the position of having to provide services to members all year even though they only pay dues during the months in which they are employed.

#### B. Members' Dues

A local union is statutorily entitled to collect dues and initiation fees from its members in certain minimum amounts, but increases in such amounts must be approved by majority vote of the members themselves in a secret ballot, 29 U.S.C. § 411(a)(3). Wollett testified that it is common for a CBA to include a "union security clause" requiring each employee to become a union member and pay the dues. Mee testified that the IBT constitution fixes the minimum amount of dues to be charged by local unions at twice an employee's hourly rate of pay per month (*e.g.*, an employee earning $10 per hour would pay $20 per month in dues). Johnston testified that Debtor has approximately 7,160 members, of whom over 80% are farmworkers and food processing workers; between 50% and 60% of the members are farmworkers with an average wage of approximately $7 per hour, with an average wage for the

---

4. It was possible to compare Johnston's projection for 1995 to the actual results for that year: actual income was approximately $37,000 less than projected and actual expenses were approximately $36,000 less than projected; actual and projected net changes in cash flow differed by only $184.

other members of between $10.50 and $11 per hour—Gallegos testified that "some" of Debtor's members are employed by United Parcel Service and "some" are subject to a master freight agreement of IBT, but most are employed as farmworkers earning an average of $7 per hour. Johnston explained that the formula by which Debtor calculates its members' dues is the lesser of two and a half times the average hourly wage under a CBA or twice such wage plus five. Wollett characterized the role of a local union with respect to its members' dues as that of a fiduciary, citing 29 U.S.C. § 501.

### C. Per Capita Tax

Local unions may be affiliated with national or international "parent" unions, as Debtor is affiliated with IBT and JC7. A condition of affiliation may be that the local union remit to the parent union a portion of the dues that the local union collects from its members, *i.e.*, a per capita tax. Johnston testified that the IBT constitution and the JC7 by-laws, respectively, call for Debtor to pay monthly per capita tax of $4.90 and $1.60, respectively, per member.

Mee testified that the $4.90 payable to IBT includes a $1 assessment that "kicks in" whenever the net value of IBT's assets falls below $20,000,000 (exclusive of certain real property), and that the current assessment commenced in 1994; Johnston testified that the assessment persisted at time of trial and would continue indefinitely. Mee explained that IBT entered into a consent decree with the United States government in 1989 to settle pending litigation, and that performance under that decree had cost IBT over $48,000,000. In 1991, "the strike fund became a political issue" and convention delegates voted to increase benefits paid by the fund from $55 per week to $200 per week. By 1994, the strike fund was depleted and IBT had to borrow $15,000,000 to conclude a pending general freight strike that involved 80,000 workers. Mee said that "[t]he bottom line was that we broke the strike fund", the general fund "continued to dwindle" due to the expense of complying with the consent decree, and IBT's assets "dropped well below" the level that called for the extra $1

assessment. IBT attempted to restructure the per capita taxes and charge a percentage of earnings rather than a flat rate (which would have favored local unions, such as Debtor, that were composed primarily of workers earning low wages), but the proposal was voted down by local unions that would experience per capita tax increases under it. IBT then began "belt tightening" and has now "stripped down anything" that is financially burdensome, though it is still unable to provide $200 per week strike benefits and has had to return to the $55 per week level.

### D. Affiliation

Wollett described what he sees as the general advantages of a local union's affiliation with a parent union: the availability of funds from a parent union with which to pay strike benefits is "a critical factor" in the ability to mount "credible" strikes that will influence employers and be perceived as more than "idle threats" by local unions whose members cannot afford to strike; research facilities are required when a local union is negotiating a CBA, to provide data concerning conditions throughout the industry; lobbying is important to protect and advance the members' interests before state and federal legislatures; an affiliated local union is not permitted by IBT or JC7 to strike unless the strike is "sanctioned" by the affiliate, and a sanctioned strike is more effective with employers and the public than one that is not supported by a powerful parent union. In addition, Mack and Gallegos testified that IBT and JC7 provide legal services to their affiliated local unions; Mee, Gallegos, and Johnston testified that IBT and JC7 provide training and education services to their affiliated local unions; and Mee and Johnston testified that IBT provides a computerized accounting system to its affiliated local unions. Mack and Mee testified that Debtor receives more than its proportionate share of the benefits that are provided by IBT and JC7 to all affiliates; this is the case because most of Debtors' members earn low wages and therefore pay low dues, so that Debtor must depend upon IBT and JC7 for some services that other local unions can afford to maintain and provide to their members themselves. Johnston estimated that the value of

tangible services and benefits received by Debtor from IBT and JC7 during the period from 1985 through 1994 totalled at least $4,967,500: legal services worth $720,000, strike benefits of $1,750,000, lobbying services worth $500,000, administrative and consultant services worth $500,000, research and assistance worth $100,000, organizing assistance worth $377,500, and computer services that would cost $120,000 to replace and maintain; Johnston did not attempt to place a value upon intangible benefits of affiliation such as the use of the name "Teamsters", the enhanced impact of a strike sanctioned by the parent union, etc. Debtor's financial statements from 1985 through 1994 reflect total per capita tax payments of $5,255,784 during the ten year period that was the subject of Johnston's testimony.

### E. Termination of Affiliation

Wollett testified that, if an affiliated local union were to terminate its affiliation, it would risk being sued for breach of its contracts with the affiliates, and such a step could also impair existing CBAs if employers were to take the position that CBAs with an affiliated local union need not be honored if the affiliation ceased. Gallegos testified that, in formulating Debtor's Plan, he did not consider providing for Debtor to "disaffiliate" with IBT because he did not believe that Debtor's members would accept such a step, inasmuch as "our members are Teamsters" and Debtor's affiliation with IBT had been presented to potential members as a benefit in the ten or twelve campaigns that Gallegos had handled since 1985 to organize workers and induce them to join Debtor. Johnston testified that, in deciding what kind of reorganization plan to propose, he considered that "the members of the union were paying their dues to belong to a specific organization with specific benefits and services which were provided by the organization to the members and that it was not clear to me, in my mind, if proposing a plan that had the very real potential to change so dramatically the benefits and services available to our members, the kind of changes that would occur in the event of a disaffiliation, it wasn't clear to me that we had any right to do that.

And that was certainly a factor that I took into account in formulating the plan".

### F. Increase In Members' Dues

Gallegos testified that, in formulating Debtor's Plan, he considered the possibility of providing for an increase in members' dues but did not include such a provision because he "felt that [the members] will not accept another increase". He said that dues were already at a level exceeding the minimum established by IBT and, when the members were asked in late 1988 to increase their dues, they voted to reject the increase "by a big margin". After that vote, Gallegos closed satellite offices and eliminated Debtor's toll-free telephone number, laid off one clerical worker and two business agents, and "started to rein in where we could cut". In the spring of 1989, Debtor again asked the members to increase their dues, which proposal was voted upon and passed "by a small margin". Gallegos said that, at some unspecified time before or after those votes, the members became "so dissatisfied" with a two cent dues increase devoted to organizing campaigns that 75% of the members successfully petitioned Debtor to discontinue it, and "that alone told me I couldn't do that".

### G. Non–Payment Of Per Capita Tax

Gallegos testified that, when he was first elected President in 1985, Debtor was some $1,000,000 in debt, consisting primarily of delinquent per capita tax payments owed to IBT, JC7, and the Western Conference of Teamsters (which entity has since been eliminated). After Gallegos became President, Debtor suffered several judgments arising out of events that occurred prior to Gallegos' election and incurred a liability of approximately $150,000 to Western Growers Pension Fund by withdrawing from that program. Johnston testified that, by April 1988, Debtor owed IBT approximately $400,000 in delinquent per capita tax and needed $500,000 to post a bond in connection with an appeal; IBT agreed to lend the money for the bond on condition that both the $500,000 and the $400,000 be secured by a first deed of trust on Debtor's real property. Gallegos realized that it was necessary to "restructure" Debt-

or, "to get our local into a shape where it can financially run itself and be current with our bills", and he took measures toward that end between 1985 and 1989, including: audits of Debtor's books, reduction of staff from seventeen business agents to thirteen and from seven clerical workers to four or five, reduction of his own salary by $20,000 and of each business agent's salary by $15,000 to $20,000, and reduction of automobile allowances and other benefits. In late 1985 or early 1986, Gallegos asked Arnie Weinmeister, Vice President of IBT and a Chairman of the Western Conference, whether the delinquent per capita taxes could be waived or forgiven, which request was denied; Mr. Weinmeister told Gallegos that Debtor's job was to be "solvent" and that, if Debtor could not pay its debts, "somebody else was going to take over what we were doing". In May 1986, Gallegos met with Jackie Presser, who was at that time the General President of IBT, concerning Debtor's indebtedness to IBT; in 1988, Gallegos met with a Mr. Mathis, who was at that time the General Secretary/Treasurer of IBT, about Debtor's financial condition— Gallegos said that neither of those representatives indicated that IBT would consider waiving or forgiving the debt owed by Debtor to IBT. Mee testified that, to his knowledge, from 1992 to the time of trial, IBT had never waived per capita tax debt for any affiliate. Gallegos testified that, in formulating Debtor's Plan, he did not consider relief from per capita taxes to be an option that was available to Debtor. As for past per capita tax defaults, the Plan provides for those claims on a par with other secured and unsecured claims and Gallegos said that, to his knowledge, no one connected with Debtor had entered into any agreement with IBT or JC7 to make any arrangement for repayment of those entities' existing claims other than as they are treated by the Plan.

Johnston, who described himself as the employee of Debtor who was primarily responsible for negotiating and drafting the Plan, testified about the possibility of reducing or temporarily eliminating future per capita tax payments. He said that, in early 1993, while attempting to formulate a plan of reorganization for Debtor, he spoke by telephone with Tom Shay, an International Vice President of IBT and an International Director of the Western Conference of Teamsters, and told Mr. Shay that two of the alternatives being considered in connection with Debtor's reorganization efforts were asking IBT for a secured loan with which to fund a plan, and/or asking IBT to permit Debtor to pay future per capita taxes in a reduced amount, "something that the growers had brought up repeatedly". Johnston said that Mr. Shay's initial reaction to the latter alternative was to laugh, as if he thought that Johnston was making a joke; Johnston explained that "it had been actually raised seriously" and Mr. Shay replied that "he didn't even need to check with anybody on the question of [IBT] agreeing to or allowing to move forward or in any way accepting or allowing a plan that contemplated not— [Debtor] not paying [IBT] their per capita in the future." Johnston said that Mr. Shay explained that "We have 600 locals out there, and all of them, at one time or another, have financial reasons that they think that there's something better to do with their money than pay the per capita. And this just opens up Pandora's box". At about the same time, Johnston made the same proposal regarding future per capita tax payments to Richard Bell, an officer of IBT, who "didn't find it as amusing as Tom Shay had and basically said, 'Well, I'm not a decision maker on these things, but I've been handling the finances at this place for the last fifteen years, and I can tell you that will never go anywhere'". During the same period of time, Johnston also raised the subject in a conversation with Ralph Torissi of JC7, who "was very angry in response to that, or appeared so to me, and said that that was ridiculous and out of the question"; Johnston spoke to Mack about Mr. Torissi's reaction later that same day, and Mack "essentially confirmed to me what Ralph Torissi had said that, in terms of a waiver of—long-term waiver of prospective per capita, that that was something that it was frivolous to even bring up at [JC7] because they would do everything in their power to block that". Johnston testified that, at some unspecified time during the District Court litigation between Creditor and Debtor, JC7 did loan Debtor some $35,000, half of the per capita tax payable to JC7 for six

months, which Johnston characterized as a "deferral" by JC7 of Debtor's obligation to pay half of the per capita tax for six months, which deferral was to extend indefinitely until the District Court litigation was resolved, with no repayment date set; he said that no similar loans have been received by Debtor from IBT. Johnston testified that IBT's executive board consists of either fifteen or eighteen members and that, of the four people with whom Johnston spoke, only Shay was on that board at the time of Johnston's inquiries.

Johnston also testified that, at the time he prepared Debtor's Plan and its prior versions and approached IBT about a possible waiver of some future per capita tax, claims were being asserted against Debtor by Creditor and another grower totalling $18,000,000 to $20,000,000 but, by the time the District Court litigation between Debtor and Creditor commenced, the other grower had settled and Creditor was asserting a claim of only $3,000,000 or $4,000,000; Johnston acknowledged that the District Court's judgment is for approximately $500,000, an amount equivalent to one or two years' worth of per capita tax payments. Johnston stated that he would not consider a plan to be proposed in good faith that provided for suspension of per capita tax payments in order to pay Creditor's judgment, for several reasons: Creditor's judgment is not against IBT and JC7 and the expense of satisfying it should not be shifted to them; Creditor's judgment might not remain at $500,000 after numerous appeals have concluded; and "I have no reason whatsoever to believe" that unsecured creditors on a par with Creditor would vote for a plan that paid Creditor "ahead of them and in different amounts than them". Johnston also said that he did not believe that a plan that deferred per capita tax for just one year would be feasible even if IBT and JC7 were to agree, because Debtor is going to have to incur "a substantial amount of debt" by borrowing the value of its tangible assets and deferral of per capita taxes would represent additional debt and "there's only a certain amount of debt load that this entity can handle".

## H. Consequences Of Non–Payment Of Per Capita Tax

When a local union does not comply with the requirements of its affiliation such as payment of per capita tax, the affiliate has various contractual rights. Johnston testified that, in 1985, IBT held hearings on whether to impose a trusteeship upon Debtor due to the delinquencies in payment of per capita tax, but did not impose one because it wanted to give Gallegos' new administration time to make an effort to pay the arrears— however, Debtor was not permitted to send delegates to the IBT convention and IBT did withhold strike benefits from Debtor. Debtor's eligibility to receive strike benefits was reinstated in 1988 in view of Debtor making current per capita tax payments as they came due and having observed a repayment plan for "several years" with respect to the arrears, and benefits were paid in 1989; IBT did not reduce or eliminate any of Debtor's other benefits during the period of arrearage. While Debtor's payment of per capita tax was in arrears, IBT did not attempt to dissolve Debtor, or to merge it with another local union, but Johnston stated that, "In the last several years", IBT has been "much more aggressive" in imposing trusteeships, with 60 out of 600 locals having been placed in trusteeship in the past five years, "which is probably as many as it placed in trusteeship for the entire history of the Teamsters Union. Various locals that were not financially self-sufficient have been merged into other locals. There simply has been, in my observation, at least, a much more aggressive use of the authority of [IBT] to deal with these kinds of problems that has coincided with [IBT] being much less rich than it once was". Johnston testified that trusteeships have been imposed "on occasion, because of financial mismanagement; on occasion, because of corruption; on occasion, because of failure to deliver adequate representation to the members; and, generally, because of a combination of those things". Johnston testified that, in April 1989, IBT installed a representative to supervise Debtor's administrative affairs on behalf of IBT, due to Debtor's "deteriorating" financial condition.

Mee testified that, when faced with delinquent per capita tax payments with other local unions in the past, IBT had performed audits and merged local unions. He stated that "per capita tax belongs all to 1.4 million people, not [IBT]. And it's not fair for one entity of the union not to pay their bills". As to whether it is in IBT's own economic interests to help maintain local unions, Mee said that was so "to a point", but "when we're looking at the big picture, the entire 1.4 million people, when a local union becomes such a financial drain with no way to cure it, there has to be steps taken to protect the majority of the membership. And at that point I would ask the general executive board to direct the general counsel to do what—legally what we needed to do to bring this situation to a conclusion because it's no longer tolerable under the circumstances".

## I.  Liquidation Issues

Johnston testified that Debtor has "contemplated" converting the case to Chapter 7 but such a move "would seriously damage our members, so I have great difficulty imagining a situation in which we would actually undertake a liquidation plan. There seems to have no up side and a ton of down side". Gallegos testified that the purpose of proposing a reorganization plan (and specifically the Plan that has been offered for confirmation) "was to make sure that our creditors are first taken care of and that our organization can function as an organization".

Clark testified that his firm has performed certified audits of Debtor since 1985. He said that he prepares financial statements in connection with such audits and has never included as assets of Debtor any CBA that Debtor has negotiated on behalf of its members with their employers and to which Debtor is a party.

May testified that he appraised Debtor's real property in February 1995 and estimated a total value of $705,000 (the Plan provides for the property to be re-appraised at confirmation, and it is the later value that will determine the amount paid to creditors under the Plan).

## III.

### ANALYSIS

As set forth above, Creditor's objection to confirmation and the failure of Creditor's class to vote to accept the Plan require consideration of whether the following criteria for confirmation have been met:

1/ The Plan must have been proposed in good faith, as required by 11 U.S.C. § 1129(a)(3).

2/ The Plan must propose to pay Creditor at least as much as Creditor would receive if Debtor were liquidated under Chapter 7, as required by 11 U.S.C. § 1129(a)(7)(A)(ii).

3/ The Plan must be "fair and equitable" to Creditor within the meaning of 11 U.S.C. § 1129(b)(1) by not violating the Absolute Priority Rule of 11 U.S.C. § 1129(b)(2)(B)(ii).

■ As the proponent of the Plan, Debtor bears the burden of establishing each of these elements, see In re Acequia, 787 F.2d 1352 (9th Cir.1986), by a preponderance of the evidence, see In re Arnold and Baker Farms, 177 B.R. 648 (9th Cir. BAP 1994), aff'd, 85 F.3d 1415 (9th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997).

### A.  Good Faith

■ The term "good faith" in the context of 11 U.S.C. § 1129(a)(3) is not statutorily defined but has been interpreted by case law as referring to a plan that is "intended to achieve a result consistent with the objectives of the Bankruptcy Code", see In re Corey, 892 F.2d 829, 835 (9th Cir.1989), cert. denied, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990) ("Corey"), citing In re Stolrow's, Inc., 84 B.R. 167 (9th Cir. BAP 1988) ("Stolrow's") and In re Jorgensen, 66 B.R. 104 (9th Cir. BAP 1986) ("Jorgensen"). Further,

... there is a legal distinction between the good faith that is a prerequisite to filing a Chapter 11 petition for reorganization and the good faith that is required for confirmation of a plan pursuant to 11 U.S.C. § 1129(a)(3). [Citation omitted] [¶] Good faith in proposing a plan of reorganization

is assessed by the bankruptcy judge and viewed under the totality of the circumstances. [*Jorgensen*]. Good faith requires that a plan will achieve a result consistent with the objectives and purposes of the Code. [*Jorgensen*]. It also requires a fundamental fairness in dealing with one's creditors. *Id.*

*Stolrow's*, at 172. *Stolrow's* and *Jorgensen* are cited with approval by the Ninth Circuit case of *Corey*—taken together, these cases provide a three part test by which to determine whether a plan has been proposed in good faith:

1/ It must intend a result that is consistent with the objectives of the Bankruptcy Code; and

2/ It must demonstrate fundamental fairness in dealing with creditors; and

3/ In addressing the issue of good faith, the totality of the circumstances must be considered.

### (1) Result Consistent With Objectives of Bankruptcy Code

■ Gallegos and Johnston testified that the purpose of the Plan was to address Debtor's obligations to creditors while enabling Debtor to remain in operation as a labor union representing over 7,000 members. Such a result is clearly consistent with the objectives of the Bankruptcy Code, and there was no evidence suggesting that the Plan was intended to accomplish some different or contrary aim. The Court notes that a possible alternative to Debtor's Plan would be for IBT to merge Debtor with another local union and thereby create an entity with the financial ability to pay its debts in full, and it is an open question whether Congress intended for labor unions to avoid that solution by discharging their debts in bankruptcy—however, Creditor has cited no authority, nor has this Court located any, that answers that question.

### (2) Fundamental Fairness Toward Creditors

As discussed below, there is no unfair discrimination among creditors and the Plan proposes to pay at least as much as would be available to each creditor if Debtor's estate were to be liquidated under Chapter 7, plus any gain realized by Debtor through sale or refinancing of assets during the five years post-confirmation. Gallegos testified that, to his knowledge, there is no agreement by or on behalf of Debtor to favor IBT or JC7 over other creditors by giving them anything other than that which is provided for them by the Plan. Debtor has demonstrated fundamental fairness in dealing with creditors and there is no evidence suggesting otherwise.

### (3) Totality of Circumstances

It is obvious that Debtor would have more money to devote to unsecured claims such as that of Creditor if Debtor could increase its income (by raising members' dues) or decrease its expenses (by reducing, deferring, or eliminating payment of per capita taxes), or both. Creditor considers it to be a lack of good faith for Debtor to propose a plan that provides for neither of these steps to be taken, and to have made no genuine effort (in Creditor's view) to include such measures in the Plan. Creditor cites no authority (nor has the Court located any) for the proposition that, in order to propose a plan in good faith, a Chapter 11 debtor must explore and consider all possible alternative forms of plans, or all feasible alternative forms, or even any alternative forms so long as the one that is proposed meets the requirements of 11 U.S.C. § 1129(a).[5] However, the Court will assume for the sake of argument that such considerations might properly be taken into account as part of the totality of the circumstances surrounding formulation and presentation of a plan, and will address each of Creditors' complaints as follows.

### (a) Seeking Dues Increase

Creditor argues that Debtor should not have proposed a plan without first attempt-

---

**5.** Instead, the Bankruptcy Code provides that, once the exclusivity periods of 11 U.S.C. § 1121 have expired (which occurs during or at the end of the first six months of a case, unless extended by the court for cause), a creditor is free to file its own plan; Creditor has not availed itself of that remedy.

ing to increase dues. The evidence is that Debtor did seek an increase in late 1988 and the members voted against it "by a big margin"; after paring some administrative expenses and laying off three employees, Debtor again sought a dues increase in the spring of 1989 and won "by a small margin"; at some point either before or after these events, 75% of Debtor's members petitioned for and won discontinuance of a two cent increase earmarked for organizing campaigns. Gallegos testified that he did consider seeking an increase in dues with which to fund a plan of reorganization but, based on those experiences, he concluded that it would be futile to ask the members to increase their dues for that purpose.

It is true that the Plan was filed in March 1995, several years after the 1988 and 1989 votes (it is unclear when the petition to discontinue the two cent increase occurred), and it is possible that the members' views on the subject might have been different by 1995 had they been asked to consider a nominal [6] increase at that time. However, it is equally possible (and entirely plausible) that members who would not pay additional dues of two cents to benefit themselves and fellow workers by increasing union membership might be even more disinclined to pay a larger amount for the sake of benefitting Creditor, who sued their union and alleged that some of the members engaged in lawless violence. Gallegos is in a position to judge the attitude and likely reaction of the members and there is no evidence suggesting that, in coming to the conclusion that he did, his premises were faulty or he was guided by some ulterior motive such as a bad faith desire to punish Creditor.

The Court notes that, when the members rejected prior requests for dues increases, they were not told that Debtor would be forced into liquidation unless dues were increased, which is what would ultimately occur now if Debtor were unable to confirm a Chapter 11 plan due to the lack of a provision for increased dues. It is certainly possible that, faced with such a choice, the members would agree, although perhaps reluctantly, to raise their dues. Debtor contends that such an approach could run counter to federal labor law, for two reasons. First, 29 U.S.C. § 411(a)(3) provides that dues may be increased only by majority vote of the members and the Ninth Circuit has found that

> The clear purpose of [the statute] is to curb the potential for autocratic and unrepresentative rule of union officers, *see Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1239 (2d Cir.1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980), by preventing the leadership of a union from imposing arbitrary financial exactions unilaterally on its membership. *Mori v. International Bhd. of Boilermakers, Local 6*, 653 F.2d 1279, 1284 (9th Cir.1981), *cert. denied*, 454 U.S. 1147, 102 S.Ct. 1011, 71 L.Ed.2d 301 (1982); *King v. Randazzo*, 346 F.2d 307, 309 (2d Cir.1965). [The statute] was designed to vest control over increases in rates of dues in the union members, not the union management.

*Burroughs v. Operating Engineers Local Union No. 3*, 686 F.2d 723, 728 (9th Cir. 1982). Debtor argues that putting pressure upon the members by presenting them with an ultimatum requiring a vote to increase dues on pain of losing their union altogether could reasonably be construed as an exercise of the control that unions are forbidden to assert over the rates of dues. Second, 29 U.S.C. § 185(b) provides that money judgments against unions are enforceable only against the union and its assets, not against members and their assets:

> When Congress passed [the statute] it declared its view that only the union was to be made to respond for union wrongs, and that the union members were not to be subject to levy....[The statute] exempts agents and members from personal liability for judgments against the union (apparently even when the union is without assets to pay the judgment).

*Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 247—248, 82 S.Ct. 1318, 8 L.Ed.2d 462

---

**6.** If 7,000 members each paid an average of an additional $1 per month, Debtor could collect $84,000 per year, which would pay Creditor's claim of $526,692 in full within just over six years.

(1962). Debtor maintains that leaving members with no realistic option other than to raise their dues for the sake of paying Creditor's judgment against Debtor could be considered to violate the spirit of the statute, which prohibits Debtor from shifting its own liability under the judgment to its members. These are valid points, although the Court discerns a difference between exerting pressure upon the members and merely informing them of the ramifications of a course of action, *e.g.*, that a bankruptcy court might convert a case to Chapter 7 unless dues are raised to pay creditors, or that IBT might appoint a trustee unless dues are raised to pay per capita tax arrears. Further, while the Plan does not directly impose upon Debtor's members the additional expense of partially satisfying Creditor's judgment pursuant to the Plan (since members' dues will not be increased), the members are indirectly contributing to payment of Creditor in the sense that income devoted by Debtor to repayment of the reorganization loan will not be available to be spent on services to members. In any event, Debtor's decision not to seek a dues increase with which to fund the Plan appears to have been a rational one that was not based upon bad faith.

### (b) Seeking Affiliates' Consent To Reduction Or Deferral Of Per Capita Tax

Creditor also contends that Debtor should not have proposed a plan without first having sought reduction or deferral of some or all of the per capita taxes from IBT and JC7. Again, the evidence is that Debtor did just that; in this case, unlike Debtor's requests to members for increased dues, some of the overtures were made fairly close to the time that the Plan was filed in March 1995.

Gallegos approached both the Vice President and the General President of IBT in 1986, and then the General Secretary/Treasurer of IBT in 1988 about forgiving or waiving delinquencies, to no avail.

In 1993, Johnston approached an International Vice President of IBT about relief from future per capita taxes and was first laughed at and then lectured about not opening Pandora's box, while another officer of IBT with fifteen years' experience handling IBT's finances told him that such a proposal "will never go anywhere". At about the same time, an officer of JC7 was "very angry" at the suggestion and characterized it as "ridiculous and out of the question", while Mack said it would be "frivolous" to bring the matter up because JC7 "would do everything in their power to block that".

There was uncontroverted evidence that IBT and JC7 had never *waived* per capita taxes for any local union. It is true that JC7 did *defer* payment of 50% of six months' per capita tax (approximately $35,000) indefinitely during Debtor's litigation with Creditor in the District Court, but that fact is not necessarily inconsistent with the position that Johnston said was taken by two JC7 officers in 1993—if that transaction occurred prior to Johnston's 1993 conversations, it may be that JC7 considered that it had already assisted Debtor and was not prepared to do anything more; if the transaction occurred after Johnston's 1993 conversations, it may be that, although JC7 was willing to forgo timely payment of $35,000 (25% of a year's per capita tax) in order to assist Debtor with litigation, it was nevertheless unwilling to make larger contributions for other purposes. Johnston testified that IBT never offered any similar accommodation to Debtor, which is consistent with Mee's testimony about IBT's recent financial difficulties and general "belt tightening" (although mere deferral is not the same as outright waiver and would not necessarily open Pandora's box as feared by Mr. Shay).

It is also true that only one of the IBT officers approached by Johnston was on the executive board of fifteen or eighteen members. Nevertheless, the representatives with whom both Gallegos and Johnston spoke were all high-ranking officers who could be expected to have familiarity with the organizations' general practices and policies, and a reliable sense of what kind of decisions were likely to be made in certain areas. The vehement and unanimous responses to Debtor's proposals strongly suggest that both IBT and JC7 had firm policies against relieving local unions of the per capita tax obligation, such that Gallegos and Johnston were

justified in concluding that it would be futile to make formal requests for such concessions in connection with the Plan.

Johnston also stated that a plan that did not propose to pay future per capita taxes as due was flawed, in his view, for reasons in addition to his belief that Debtor's affiliates would not permit such action. He considered it unfair to shift payment of Creditor's judgment to IBT and JC7 when they were not the judgment debtors.[7] He also believed that such a plan might not be feasible, since it would create future debt in the form of deferred per capita taxes that could exceed Debtor's ability to pay.

Under all of these circumstances, Debtor's decision not to make formal application for relief from future per capita taxes, and not to file a plan providing for such relief, was justified and the evidence does not suggest that such decision was the product of bad faith on the part of anyone connected with Debtor.

### (c) Proposal To Reduce Or Defer Per Capita Tax Despite Lack of Affiliates' Consent

Creditor also urges that Debtor should have proposed a plan calling for reduction or deferral of per capita tax regardless of whether IBT and/or JC7 would consent to such treatment.

It appears from Debtor's Disclosure Statement that neither IBT nor JC7 (nor the combination of them) could block confirmation of such a plan, since they do not control (singly or combined) their class of general unsecured creditors. However, IBT's secured claim is the sole creditor in its class and that class is impaired, so IBT theoretically could block confirmation if it caused its class to reject the Plan and Debtor was unable to effect cramdown.

Assuming for the sake of argument that Debtor were able to prevail over efforts of IBT to block confirmation of such a plan, Creditor cites no authority (nor has the Court located any) that would permit the Bankruptcy Court, through confirmation of a Chapter 11 plan, to control the post-confirmation activities of Debtor and its affiliates by forcing IBT and JC7 to perform under their contracts with Debtor and render post-confirmation services, while relieving Debtor from its contractual duty of having to pay for such services.[8] Accordingly, if Debtor were to fail to pay per capita tax that arose post-confirmation, Debtor would be in breach of its contracts with IBT and JC7. Creditor urges that there is no reason to believe that such a breach would cause serious repercussions, because it is in the best interests of affiliates to maintain local unions intact. However, Johnston testified that Debtor has suffered consequences in the past for falling behind in per capita tax payments, in that IBT withheld strike benefits, did not permit Debtor to send delegates to the IBT convention, and assigned a representative to supervise Debtor. IBT also considered imposition of a trusteeship upon Debtor in 1985 and Johnston testified that IBT has recently been "much more aggressive" in imposing trusteeships, with 10% of local unions having been placed in trusteeship within the past five years (a figure that Johnston believed to equal the total trusteeships imposed throughout the history of the Teamsters Union); Johnston was also aware of local unions having been merged with others due to insolvency.

What, if any, consequences might attend Debtor's failure to pay future per capita taxes as they fall due can be no more than a matter of speculation. However, it is clear that IBT would have the right to take various measures upon such a default, and has taken them in the past (some of them with respect

---

7. In fact, as stated above, the District Court specifically found that Creditor had not proven the affiliates' participation in or authorization of the conduct that gave rise to Creditor's judgment against Debtor. The general rule is that local unions and their affiliates are separate legal entities without vicarious liability for each other's debts, *see United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922).

8. Debtor's obligation to pay for post-confirmation services would arise post-confirmation and would therefore constitute debts beyond the scope of the discharge provided by 11 U.S.C. § 1141(d).

to Debtor). Further, according to Johnston's uncontroverted testimony, IBT is becoming increasingly zealous about exerting control over local unions that do not meet their financial obligations; indeed, Mee testified that he would take whatever steps were legally available to IBT to "protect the majority of the membership" from a local union that had become an incurable "financial drain". It does not appear that Debtor is crying wolf when it expresses concern over how IBT might react if Debtor were to declare a moratorium on the payment of per capita taxes. It is not a lack of good faith on Debtor's part to decline to take what appears to be a tangible risk of serious sanctions, including the loss of strike benefits and the loss of autonomy through imposition of a trusteeship and/or involuntary merger.

### (d) Proposal To Terminate Affiliation

Creditor points out that Debtor could eliminate the per capita tax altogether by terminating its affiliation with IBT and JC7. Wollett testified that such a step could expose Debtor to litigation with both its affiliates and the employer parties to existing CBAs. Gallegos and Johnston testified that Debtor's members had joined an affiliated local union and it would be unfair (and perhaps illegal) to divest them of such affiliation. The evidence demonstrated that affiliation provides Debtor with tangible and intangible benefits of a value commensurate with what Debtor has been paying in the form of per capita tax. Johnston said that, in formulating the Plan, he rejected the possibility of terminating Debtor's affiliations because of the negative impact that he believed such a step would have upon the members; his conclusion is warranted by the evidence and there is no evidence suggesting that Debtor's decision to retain its affiliations was tainted by bad faith.

### B. Chapter 7 Test

A Chapter 11 plan must propose to pay creditors holding impaired claims who do not vote to accept the plan at least as much as the creditor would receive in liquidation under Chapter 7, pursuant to 11 U.S.C. § 1129(a)(7)(A)(ii); this is commonly referred to as the "best interest of creditors test", or the "Chapter 7 test". Debtor's Plan proposes to distribute to creditors an amount equal to the equity value of its real property and tangible personal property at the time of confirmation, plus any gains that Debtor may achieve through sale or refinance of assets during the five years following confirmation. If it were true that a Chapter 7 liquidation would deal only with real property and tangible personal property, this proposal would meet the Chapter 7 test.[9] However, Creditor contends that Debtors' CBAs represent value to Debtor and should therefore be included within the liquidation analysis that determines whether the Chapter 7 test is met.

It is true that, if the CBAs include union security clauses requiring each employer to employ only workers who join Debtor, which membership in turn requires the payment of dues to Debtor, the CBAs could be considered indirectly responsible for Debtor's receipt of income in the form of dues. However, the CBAs themselves are between the employers and Debtor and, while an employer may covenant with Debtor in a CBA not to employ anyone who is not a member of Debtor, the CBA is not directly enforceable by Debtor against an employee to compel the employee to pay dues to Debtor. In fact, as Debtor points out, the primary effect of CBAs upon Debtor is the imposition of a duty owed by Debtor to its members to monitor and enforce the CBAs. Accordingly, the extent to which the CBAs represent assets of any actual economic value to Debtor is questionable at best (such conclusion is consistent with the testimony of Clark, who has never treated CBAs as an asset in his preparation of Debtor's financial statements).

---

**9.** In fact, it would exceed the requirements of that test, since it applies fair market values rather than the lower "fire-sale" values that are typically achieved in Chapter 7 liquidations, does not reduce those values by costs of sale and other administrative expenses of liquidation under Chapter 7, and provides for creditors to receive any appreciation that Debtor may realize through liquidation within five years after confirmation (which would be unavailable under Chapter 7).

■ It is also true that contracts, such as the CBAs, to which a bankruptcy debtor is a party are property of the debtor's bankruptcy estate under 11 U.S.C. § 541(a), *see In re Computer Communications, Inc.*, 824 F.2d 725 (9th Cir.1987). However, the CBAs to which Debtor is a party do not represent property of Debtor's estate that would be capable of liquidation under Chapter 7. If Debtor were in a Chapter 7 bankruptcy case, only the Chapter 7 trustee could operate Debtor's business, pursuant to 11 U.S.C. § 721, and Debtor itself could not continue to do so. Since members of a collective bargaining unit are entitled by federal labor law to select their own representative, a bankruptcy trustee could not take over the representation of Debtor's members because the trustee was not elected by the members, *see NLRB v. Financial Institution Employees Local 1182*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986), and the trustee therefore could not perform Debtor's role under existing CBAs with respect to employees unless the employees consented. Further, employers are not required to recognize or bargain with any representative other than the one elected by the employees, *see Whisper Soft Mills v. NLRB,* 754 F.2d 1381 (9th Cir.1984), so a bankruptcy trustee could not perform Debtor's role under existing CBAs with respect to employers either unless the employers consented. For the same reasons, a bankruptcy trustee could not assign the CBAs to another in exchange for consideration, because the assignee would share the trustee's legal disabilities with respect to dealing with the employees and the employers under the CBAs; further, 11 U.S.C. § 365(c)(1) prohibits the assignment of a bankruptcy debtor's executory contracts when applicable law excuses the other party from accepting performance from, or rendering performance to, anyone other than the bankruptcy debtor. Accordingly, while it is technically true that the CBAs should be included in Debtor's liquidation analysis because they are property of Debtor's estate, the liquidation value of such property is zero and their inclusion therefore does not alter the liquidation analysis.

■ Rather than asserting that the CBAs must be included in Debtor's liquidation analysis, Creditor may mean to argue that it is Debtor's right to receive future dues from its members that should be included. Such a contention would be untenable for several reasons. First, under Chapter 7, Debtor would cease to function as an entity and could therefore no longer collect dues or provide services in exchange for them. Further, 11 U.S.C. § 541(d) provides that property in which a debtor holds only legal title but no equitable interest becomes property of the bankruptcy estate only to the extent of the title held by the debtor and not to the extent of any equitable interest that is not held by the debtor, and *see Begier v. Internal Revenue Service*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); *In re Coupon Clearing Service, Inc.*, 113 F.3d 1091 (9th Cir.1997)—in this case, the dues collected by Debtor from its members are subject to 29 U.S.C. § 501(a), which provides (in pertinent part) as follows:

> The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, *to hold its money and property solely for the benefit of the organization and its members* and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder.... [emphasis supplied]

Finally, to any extent that Debtor's right to collect dues might somehow become property of the Chapter 7 estate, a bankruptcy trustee nevertheless could not enforce that right and compel the members to pay dues to the estate because, as discussed above, the members are entitled to elect their own representative and are not required to accept a bankruptcy trustee (or an assignee thereof) in Debtor's stead. Accordingly: Debtor's right to collect dues would not survive the commencement of a Chapter 7 case, so nothing would exist to become property of the estate; in any event, such right represents an interest in only bare legal title to dues collected and nothing more could become property of

the bankruptcy estate; finally, the liquidation value of such right would be zero, both because it would consist of only bare legal title, and also because the right would be unenforceable against the union members by a bankruptcy trustee.

### C. Absolute Priority Rule

Compliance with the Absolute Priority Rule is one of two prerequisites for "cramdown", which is permitted by 11 U.S.C. § 1129(b)(1) if a plan fails to meet the requirement of 11 U.S.C. § 1129(a)(8) that each impaired class has voted to accept the plan, but does meet each other applicable requirement of 11 U.S.C. § 1129(a):

> ... if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

With respect to the first prerequisite for cramdown, Creditor has not complained of unfair discrimination, nor is any such discrimination apparent to the Court.

> A plan discriminates unfairly if it singles out the holder of some claim or interest for particular treatment. [Citation omitted] [¶] Courts have denied confirmation of Chapter 11 plans that proposed widely disparate treatment of similarly situated creditors as unfairly discriminatory. [Citations omitted].

*In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994). The Plan forms three classes of unsecured nonpriority creditors: one consisting of "convenience claims" for $1,000 or less (including the claims of creditors who are willing to reduce their claim to $1,000); one consisting of undisputed and liquidated contract claims; and one consisting of disputed and unliquidated tort claims. The Plan provides that the "convenience class" is to be paid in full within sixty days of the Plan's effective date—all funds available for distribution to unsecured

nonpriority creditors after payment of the "convenience class" are to be distributed pro-rata between the class of undisputed and liquidated contract claims and the class of disputed and unliquidated tort claims, then pro-rata within each class to the holders of claims allowed in each class. At the time the Plan was proposed, Creditor's claim was in litigation and it is appropriately included in the class of disputed and unliquidated tort claims along with other claims of the same kind; the classes consisting of undisputed and liquidated contract claims and of disputed and unliquidated tort claims are treated the same. The Plan does not discriminate unfairly, in terms of either classification or treatment.

With respect to the second prerequisite for cramdown, fair and equitable treatment of an impaired class that did not vote to accept a plan is defined for purposes of unsecured creditors by 11 U.S.C. § 1129(b)(2)(B), which embodies what is commonly referred to as the Absolute Priority Rule:

> ... (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or [¶] (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Thus, as used in 11 U.S.C. § 1129(b)(2)(B), the "phrase 'fair and equitable' is not a vague exhortation to bankruptcy judges that they do the right thing; rather, it implements the so-called absolute priority rule under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all", *In re Perez*, 30 F.3d 1209, 1212–1213 (9th Cir.1994).

Creditors argue that the Absolute Priority Rule is not met here because Debtor will continue in existence and in possession of its property, even though Creditor and other unsecured creditors will not be paid in full. However, the Absolute Priority Rule does not provide that a debtor entity may not receive or retain property unless all creditors have been paid in full, it provides that "the

holder of any ... interest" in a debtor entity may not receive or retain property on account of such interest unless all creditors have been paid in full. An "interest" is that which is held by an "equity security holder", pursuant to 11 U.S.C. § 501(a); an "equity security holder" is defined by 11 U.S.C. § 101(17) as the "holder of an equity security of the debtor"; an "equity security" is defined by 11 U.S.C. § 101(16) as a share in a corporation "or similar security" (or certain warrants or rights concerning the same), or the interest of a limited partner in a limited partnership (or certain warrants or rights concerning the same). In the case of a Chapter 11 debtor that is a corporation or partnership, the Absolute Priority Rule prevents the shareholders or partners from receiving anything on account of their interests in the corporation or partnership, and from retaining the benefits of such interests, unless all creditors have been paid in full (or agree to different treatment). Debtor in this case is an unincorporated nonprofit [10] association (such as a fraternal organization, or service organization) whose members have no ownership interest in Debtor akin to that of shareholders of a corporation or partners of a partnership. The IBT constitution provides that, if Debtor were to be liquidated, its assets would escheat to IBT and be transferred to the general fund, but IBT also has no ownership interest in Debtor equivalent to that of shareholders of a corporation or partners of a partnership; further, the Plan does not provide for IBT to receive or retain anything "on account of" its escheat rights and provides for IBT merely to the extent that IBT holds a creditor's claim.

Debtor cites a case involving a similar kind of entity, *Matter of Wabash Valley Power Association*, 72 F.3d 1305 (7th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 389, 136 L.Ed.2d 305 (1996) ("*Wabash* "). The Chapter 11 debtor in *Wabash* was a nonprofit cooperative formed for the purpose of generating and transmitting electric power to its members; the members were entitled to vote for the debtor's board of directors, but had no ownership interest in the entity; upon dissolution, the entity's assets escheated to

the state. The Seventh Circuit held that the Absolute Priority Rule did not apply under such circumstances, pointing out (at 1314) that Chapter 11 is "primarily designed" for profit-seeking enterprises, whereas

> By design, "in a co-operative association the concept of profit is inappropriate, because profit, in its recognized economic sense, is the wage of the entrepreneur, and in a co-operative there is no entrepreneur." Emmanuel S. Tyson, Annotation, *Co-operative associations: rights in equity credits or patronage dividends*, 50 A.L.R.3d 435, 1973 WL 33833 (1995).

*Wabash*, at 1313. Since they do not participate in profits, "[the debtor's] Members are not owners in any usual sense of the term", *id.* The Court noted that "almost the only prerogative [the debtor's] Members share with shareholders in an ordinary business corporation is the right to elect a board of directors", *id.*, and rejected a contention that such right gave rise to or constituted an "interest" within the meaning of the Absolute Priority Rule:

> Control is not essential to an equity interest, as the existence of non-voting stock demonstrates. A share of profits, however, is essential. Control alone, divorced from any right to share in corporate profits or assets, does not amount to an equity interest. [¶] The mere fact that the Members of [the debtor] are benefited by [the debtor]'s operation and might be disadvantaged by its demise also does not give them an "interest" cognizable in bankruptcy. Employees, managers and customers, among others, always have an interest, in the broadest sense, in a corporation. The factor which distinguishes these parties from stockholders is not "control" *per se* (managers, after all, have at least a limited control) but the ability to make use of that control to generate profits or to increase their own share of profits.

*Wabash*, at 1312–1319. The *Wabash* Court concurred with the analysis and outcome of *In re Whittaker Memorial Hospital Association*, 149 B.R. 812 (Bkrtcy.E.D.Va.1993), a

**10.** Debtor is not a non-profit organization in name only; Johnston's testimony demonstrated

that the expense of operating consistently equals or exceeds income.

case involving a non-profit hospital; the same result was reached for the same reasons in *In re Independence Village, Inc.*, 52 B.R. 715 (Bkrtcy.E.D.Mich.1985), in which the debtor was a non-profit organization operating a care facility for the elderly. *In re Eastern Maine Electric Cooperative, Inc.*, 125 B.R. 329 (Bkrtcy.D.Me. 1991), concerning a rural electric cooperative, came to the opposite conclusion, on the basis that the debtor's members had rights to recover patronage capital, which the Court found to constitute an "interest" for purposes of the Absolute Priority Rule.

In this case, neither Debtor's members nor Debtor's affiliates nor anyone else holds any interest in Debtor, as that concept is defined by the Bankruptcy Code and case law. The Absolute Priority Rule does not, by its terms, prohibit a debtor entity from retaining its own assets, and cannot, by its terms, apply to a situation such as this where the debtor has no equity security holders.

*CONCLUSION*

█ The Court has located reported cases concerning the filing of bankruptcy petitions by only seven other labor unions— *Highway & City Freight Drivers, Dockmen and Helpers, Local Union No. 600 v. Gordon Transports, Inc.*, 576 F.2d 1285 (8th Cir. 1978), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 678 (1978) (a case decided under the former Bankruptcy Act) (*"Highway & City Freight"*); *Matter of American Federation of Television and Radio Artists*, 30 B.R. 772 (Bankr.S.D.N.Y.1983) (a decision concerning four Chapter 11 cases under the Bankruptcy Code, in which the debtors were a national union and three of its local affiliates); *In re Highway Truck Drivers and Helpers Local Union No. 107*, 86 B.R. 404 (Bkrtcy.E.D.Pa.1988), 98 B.R. 698 (E.D.Pa. 1989), 888 F.2d 293 (3d Cir.1989); 100 B.R. 209 (Bkrtcy.E.D.Pa.1989) (a Chapter 11 case under the Bankruptcy Code); *In re Local Union 1397 of the United Steelworkers of America, AFL–CIO–CLC*, 133 B.R. 743 (Bkrtcy.W.D.Pa.1991) (a Chapter 11 case under the Bankruptcy Code)—none of which addresses the issues presented by the case before this Court. While it is apparently not common for a labor union to seek bankruptcy

protection, it is not unheard of, nor is it forbidden: the Eighth Circuit held in *Highway & City Freight* that an unincorporated association such as a labor union is eligible to file a voluntary petition under the Bankruptcy Act, and that result is unchanged under the Bankruptcy Code. Nevertheless, as can be seen from the foregoing, traditional bankruptcy analysis is not always a comfortable fit with some aspects of union organization and labor law.

For example, the Chapter 7 test must be applied to Chapter 11 plan confirmation, even though it appears that a labor union would be very unlikely to file Chapter 7 (as Johnston testified with respect to Debtor in this case), since such a step would cause the union to disband and leave its members without representation. Despite this practical reality, Chapter 11 makes no exceptions for labor unions in the plan confirmation standards that apply to other forms of bankruptcy debtors.

Another issue is the failure of the Absolute Priority Rule to account for the non-profit and escheat features of a local union such as Debtor. In the absence of legislative history or action, the courts are left to the awkward process of fitting the square peg of a non-profit association into the round hole of the Absolute Priority Rule as best they can, as is well explained by the decision in *Wabash*. This case presents a somewhat anomalous situation whereby Debtors' members are not the proponents of the Plan (since they do not own Debtor and are merely the recipients of services provided by Debtor), yet the dues they pay are Debtor's only source of income and the amount of such dues is determined solely by the members—thus, the Absolute Priority Rule cannot be applied and the good faith of the members is not subject to consideration as a prerequisite of confirmation, even though they will reap the benefits of reorganization.

A further issue is the apparent conflict between labor law's strong principle of self-governance for union members and bankruptcy law's provision for appointment of trustees in both Chapter 11 and Chapter 7 cases. The policy arguments made by

Debtor could be advanced in support of permitting unions to avail themselves of the benefits of Chapter 11, while depriving bankruptcy courts of the power to appoint Chapter 11 trustees despite the Bankruptcy Code's provision of such remedy.

Debtor in this case is not a wealthy union, consisting as it does primarily of seasonally employed agricultural workers earning an average hourly wage of only $7 (financially, a sympathetic body)—it is not offensive for an entity such as this to resort to bankruptcy to deal with its debts. However, many of the legal principles argued by Debtor here might be applied to permit a far richer union to discharge or restructure larger amounts of debt than are at issue in this case, a result that perhaps was not even considered by Congress in drafting either labor legislation or bankruptcy legislation; the parties cited no legislative history on this point, nor has the Court located any.

This Court has been limited to some extent by the way in which the parties have presented the case—Debtor called seven witnesses, of whom one was qualified as an expert, whereas Creditor called none; Debtor was represented by highly experienced bankruptcy counsel and Creditor was not.[11] As a result, various issues and areas were undeveloped that might have assisted the Court in making its analysis—for example, it could have been relevant to the good faith issue to consider whether it is common practice for local unions to "funnel up" income to affiliates to such an extent that they are left essentially judgment proof, and the ramifications of merger and imposition by IBT of trusteeship (and their impact upon Debtor's members) might have been more fully explored. The Court has attempted to reconcile the laws of labor and bankruptcy and achieve a result that is consistent with both: "When confronted with two different statutory schemes, the court must attempt to harmonize the goals and policies of each. *National Labor Relations Board v. Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482

(1984)", *In re Capital West Investors,* 186 B.R. 497, 499 (N.D.Ca.1995).

For the reasons set forth, Creditor's objection to confirmation of Debtor's Plan is overruled and the Plan shall be confirmed. Counsel for Debtor shall submit a form of order so providing, after review as to form by counsel for Creditor.

---

**11.** The Court notes that Debtor spent a considerable amount of money (some borrowed from its powerful affiliates) to pursue and litigate this Chapter 11 case, for a relatively modest recovery from the affiliates' standpoint of only some 30% on unsecured claims—the principles may be far more important to the union movement than the dollars involved here, though the same may not be true for Creditor.