## FANO v. NEWPORT HEIGHTS IRR. DIST. et al.

### No. 9147.

### Circuit Court of Appeals, Ninth Circuit.

### Sept. 5, 1940.

### Rehearing Denied Oct. 15, 1940.

Benjamin S. Crow, of Los Angeles, Cal., and C. B. Diehl, of Costa Mesa, Cal., for appellant.

Rutan, Mize & Kroese and A. W. Rutan, all of Santa Ana, Cal., for appellee, Newport Heights Irr. Dist.

Before WILBUR, DENMAN, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

On the 9th day of January, 1939, the District Court, acting under authority of Chapter IX of the National Bankruptcy Act of the United States, as amended (11 U.S.C.A. §§ 401–404), made and entered its Interlocutory Decree adjudging the Newport Heights Irrigation District, a municipal corporation organized and existing under and by virtue of the California Irrigation Act of 1897 (Cal.Stats.1897, p. 254, as amended; Deering's General Laws, Act 3854) to be "insolvent or unable to meet its debts as they mature" and confirming a proposed composition of its indebtedness. Etta A. Fano, the owner of bonds of the District refused from the start to consent to the plan, resisted its confirmation in the District Court and appeals to this court from such Interlocutory Decree.

Newport Heights Irrigation District (hereinafter for convenience referred to as the District), comprising approximately 1,500 acres in Orange County, California, was organized during the year 1918. It

issued and sold its 6% bonds at par or over in the amount of $160,000 and proceeded to construct an irrigation system. The system consisted largely of light riveted steel pipe dipped and wrapped with heavy paper. The bonds so issued and sold are in the principal amount of $800 each and mature in series, beginning with $3,200 in the year 1941 and ending with $12,800 maturing in the year 1960.

On the 11th day of November, 1937, the District filed its petition as above indicated alleging: "That on account of the adverse agricultural conditions and general depression which prevailed during the greater part of the past six years, the market value of farm products produced within Petitioner was generally less than the cost of production; that farming operations therein have been unprofitable; and the installments of taxes and tax obligations levied upon the real property within Petitioner and falling due in such period were greater than the ability of the lands to produce, or the owners to pay".

It is also alleged in the petition:

That the District is and for more than four years last past has been in default as to payments of interest on its bonds. This allegation is admitted by appellant.

That because of its inability to collect sufficient taxes to meet its obligations, the District is insolvent and is unable to meet its debts. This allegation is denied by appellant, who claims that although there have been low returns from agricultural industry in the District, still the default in payment of interest was caused by the failure to apply money available to such payment and by excessive expenditure of money for repairs, upkeep and construction; and by a failure to make higher assessments and charge higher water tolls; and by a failure to sell land upon which assessments became delinquent. Appellant also claims that a considerable part of the District has become residential rather than agricultural and that this situation has not been properly recognized by the District government.

It is alleged and admitted that the District's Board of Directors has adopted a plan for composition of its indebtedness which has been approved and accepted by owners of 89.89%[1] of the principal amount of the issued bonds.

The plan proposes that the ratio for reducing and refinancing shall be 62.50¢ on the dollar of the principal amount of the bonded indebtedness, and contemplates the purchase of the full issue of such bonds by Reconstruction Finance Corporation (hereinafter for convenience referred to as R.F.C.) at the rate mentioned. These bonds are to be retired in favor of a subsequent issue of 4% bonds to R.F.C. in the amount equal to the sum of money paid for the retired bonds with some adjustment upon cost of the refinancing, or a reduction in principal of $50,000 more or less. The only creditor is R.F.C. The only owners of bonds are R.F.C. with 89.89% of the total issue, appellant Fano with $11,200 in principal amount, and R. Kent Tanquarry, not appealing, with $4,000 in principal amount.

The agreement of the District and R.F.C. required that "repairs and rehabilitation" should be made by the District upon the irrigation system to the amount of $25,000 unless the Division Chief of R.F.C. should be satisfied with a lesser expenditure.

The problem for solution in this case is simply one of fact, to-wit: At the time of the filing of the petition was the District insolvent or unable to pay its debts as they fall due, and if so, is the proposed plan fair?

The petitioner District seems to have gotten along without great difficulty from the date of its incorporation up to the financial break in the country in the fall of 1929, and proceeded without pronounced distress to begin the year 1933 with $21,269.05 in the general fund and ended the year with cash on hand of $18,814.24 and unpaid accounts in the sum of $667. Unquestionably the impact of the great depression was felt during the year 1933 and the bondholders met the situation by voluntarily agreeing to accept a 50% cut in their interest for the year 1934. Somewhere and somehow at about this time, the District retired $9,600 of the principal bonded indebtedness, leaving $150,400 instead of $160,000 in outstanding bonds.

The testimony shows that the irrigation system was in bad repair and costly of maintenance. There was an engineering report that $15,000 would be required to put the system in good working condition and that R.F.C. through its chief of oper-

[1] Etta A. Fano, owning 14 bonds, and R. Kent Tanquarry, owning 5 bonds, declined to consent to the plan as proposed, and declined to surrender their bonds.

ations was satisfied if something less than $25,000 should be spent in this rehabilitation work. The money actually spent upon the pipe line, reservoir and new office building exceeded the sum of $50,000. The distributing system was practically rebuilt in a manner more substantial than the original construction. It is not doubted that the District got its money's worth; indeed, it drove a good bargain for it got, in addition to what it paid for, a very considerable amount of labor for improvement from government relief agencies. Unquestionably the reconstructed distribution system definitely reduced the prospective maintenance charges for years to come. However, the expenditure was top-heavy and extravagant for the period and unquestionably influenced the suspension of interest payments. It is quite reasonable to suppose that this heavy expenditure of at least twice the sheer necessity of the situation was undertaken because the proposed plan lessened the burden of the District and as it appears reduced its bonded indebtedness in about the same amount as that expended for its betterment.

The petition herein was filed in November, 1937, and the 1937 financial report ends with December 31, 1937. We shall therefore consider the financial situation as of the latter date.

On this date, according to the District's auditor's report, the accrued interest liability was $26,065.32. The statement of assets and liabilities of the District as of December, 1937, shows the following current assets:

"Current Assets:

| | | |
|---|---|---|
| General Fund | $7,500.78 | |
| Interest Fund | | $9,515.70 |
| Sinking Fund | | 935.99 |
| Bond Service Fund | | 4,200.00 |
| Unapportioned Fund | | 6,228.02 |
| Total Funds | | $13,378.93 |
| Water Charges Receivable | | 375.24 |
| Current Taxes Receivable 1937-38 Assessment | | 4,663.74 |
| Total Current Assets | | $18,417.91" |

The difference between the amount of accrued interest liability ($26,065.32) and the amount of current assets ($18,417.91) is $7,647.41. But the sum of $18,417.91 cannot all be allocated to the payment of

due interest. In the first place, since delinquencies have averaged about 5%[2] we shall deduct 5% of the water charges and current taxes receivable, or $252, leaving $18,166 (we do not carry the equation beyond the decimal point). We are not informed as to why there is a deficit of $7,500.78 in the general fund or how this figure is arrived at, but we will assume that this sum must be preserved in the fund. Therefore we deduct $7,500, leaving $10,666. We also deduct the sinking fund of $936, leaving $9,720. The interest fund is of course available, and the bond service fund (for servicing the R.F.C. loan) is available. We see no reason why the unapportioned fund should not be available. Thus we deduct the available current assets amounting to $9,720 from the amount of unpaid interest ($26,065) and we have a deficit of $16,345. We find other accounts payable for delinquencies and miscellaneous accounts in the sum of $6,374.15. This sum is not charged off as bad debts and so for round numbers we assume that $1,345 of this sum is good. Now we have an even $15,000 deficit.

We think the deficit has been caused by the reconstruction of the system and the diversion of tax moneys to the payment therefor, a sufficient part of which moneys could have been allocated to the interest fund. Thus we see, it was not the disability of the District to support itself, but the payment for heavy betterments practically upon a cash basis that brought about the embarrassment.

■■■ It is undoubtedly true that the District has not funds in hand to fully pay this due interest and in that sense is insolvent, but it is not only far from insolvent in the bankruptcy sense but owns debt free, except for the interest mentioned, assets in value many times the indebtedness, all in most excellent physical and almost new condition. These improvements greatly enhance the value of the District's property and of course of the security of the bondholders, and it would be highly unjust to allocate their cost to the bondholders, amounting to one third of their investment. In view of the small amount of deficiency in tax payments shown by the 1937 financial statements of the District [see footnote 2, supra], we are unable to find any

---

[2] The 1937 financial statement of the District shows delinquent taxes receivable for the period 1931–1937 in the sum of $5,862.60. The total taxes assessed during this period was $102,932.88. This makes the percentage of delinquency for the entire period less than 5%.

reason why the tax rate should not have been increased sufficiently to meet the District's obligations or why it can be said that the plan is "equitable" and "fair" and for the "best interest of the creditors" with no sufficient showing that the taxing power was inadequate to raise the taxes to pay them.

Reversed.