## In re WHITTAKER MEMORIAL HOSPITAL ASSOCIATION, INC. d/b/a Newport News General Hospital, Debtor.

Bankruptcy No. 90–41840–B.

United States Bankruptcy Court,
E.D. Virginia,
Newport News Division.

Jan. 25, 1993.

Nathaniel F. Jones, Jr., Venable, Baetjer and Howard, Baltimore, MD, David H. Adams, Local Counsel, Clark & Stant, P.C., Virginia Beach, VA, for debtor.

David K. Sutelan, Breeden, MacMillan & Green, Norfolk, VA.

Paul A. Feiner, Philadelphia, PA, Michael A. Rhine, Asst. U.S. Atty., Norfolk, VA, for U.S. Dept. of Housing and Urban Development.

## OPINION OVERRULING OBJECTIONS TO CONFIRMATION

HAL J. BONNEY, Jr., Bankruptcy Judge.

The Secretary of Housing and Urban Development ("HUD"), a creditor of Whittaker Memorial Hospital Association, Inc. ("Debtor"), objected to the confirmation of the debtor's amended Chapter 11 plan of reorganization. HUD is concerned that the amended plan does not satisfy the requirements of 11 U.S.C., section 1129. After notice and a hearing, the issue properly

before the Court is whether Whittaker's plan is confirmable over the objections filed by HUD.

Whittaker Memorial Hospital Association, Inc., a Virginia nonstock, membership corporation,[1] owns and operates the medical facility known as Newport News General Hospital located in Newport News, Virginia. The debtor is one of only eight minority owned or controlled hospitals in the nation and serves a minority population that is predominantly elderly and low income. On November 6, 1990, Whittaker Memorial sought the protection of the Bankruptcy Court by filing a voluntary petition under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Virginia at Newport News.

No single event precipitated the filing of the petition. Rather, several factors came together to force the debtor to seek Chapter 11 protection. Significant among these factors were doctors leaving the staff, the resulting reduction in patient referrals, an ever-increasing amount of debt, and the three most important words in real estate: location! location! location!.[2]

The debtor's anemia apparently began around 1986. At the confirmation hearing, Frank Harrelson, Chief of the Health Facilities Branch for the United States Department of Health and Human Services, Region III, testified that the hospital never operated at a profit from October 1986, nor have all 126 beds been in use. Additional evidence of the hospital's ailing financial condition was elicited from Steven Dick, President of AmeriHealth Management Co., who testified that the bed occupancy rate was 18.4% for 1991 and 18.6% for 1992.[3]

After filing the petition in bankruptcy, the debtor's Board of Trustees attempted

---

1. Virginia Nonstock Corporation Act, Va.Code Ann. section 13.1–801 through 13.1–944 (Michie 1950 & Supp.1992).

2. During the confirmation hearing, Leo Bowers, M.D., the Chairman of the Board of Trustees for the debtor, testified that he refers approximately two-thirds of his patients to facilities in Hampton, while only referring one-third of his pa-

tients to Newport News General Hospital. Dr. Bowers stated that this is due primarily to the location of his practice and of his patients.

3. By contrast, the debtor's post-confirmation financial projections require a bed occupancy rate of 41.9% for the first year after confirmation.

to sell the facility as a going concern. This attempt resulted only in nine seriously interested parties, only one of which submitted a written bid and in an amount less than the forced liquidation value of the hospital. By November 1991 the Board of Trustees had abandoned all hope of selling the facility intact.

In addition to the attempted sale, the debtor initiated several steps designed to resuscitate the hospital. Primary among these was the employment of a professional management company to run the facility. In February 1990 Whittaker entered into an employment contract with AmeriHealth Management Company, Inc. ("AmeriHealth"), a firm specializing in the management and operation of mid-size health care facilities, with the hope that AmeriHealth's experience and expertise could help rescue the ailing facility from the financial morass into which it had slipped.

With the aid of AmeriHealth, the debtor launched several projects designed to reduce costs and raise revenue; notably, the creation of a 22 bed psychiatric unit which accounted for approximately 71% of the debtor's patient days from August 1992 through November 1992;[4] a paring down of extraneous personnel; extending emergency room hours; and several projects which are currently suspended pending sufficient start-up capital.

Current financial reports tendered by the debtor give credibility to the debtor's belief that these changes will bring the facility more in tune with the needs of the community it serves and thereby increase profitability. During the four months preceding the hearing, the hospital generated an average monthly contribution margin (or net operating income) of $111,974.75, a performance record which, if maintained, would generate revenue sufficient to sustain the debtor under the plan of reorganization for the first year after confirmation. According to the debtor, a contribution margin of $1,078,000.00 will be necessary for the debtor to successfully operate the facility during the first year under the plan.[5] The debtor's annualized contribution margin, based upon performance during the first four months preceding the confirmation hearing, is $1,343,697.00. This figure exceeds the required revenue by more than $250,000.00. The debtor's financial revitalization seems to gain further support from the testimony of Dr. Bowers who testified that the financial projections of post-confirmation performance offered into evidence by the debtor are conservative.

In addition to internal restructuring, the hospital has received a significant amount of community support in facilitating a viable reorganization. Perhaps the most notable of this is the Council of the City of Newport News Resolution #7142–92, passed on November 24, 1992, which forgives a $150,000.00 non-interest bearing debt owed by the hospital to the City of Newport News. This measure is indicative of the support generated in the community. Additional backing has been offered by various political leaders, churches, and local health care agencies, including a service agreement between the hospital and the Hampton–Newport News Community Services Board which utilizes the hospital's Psychiatric Care Unit. The latter is particularly significant.

With the approval of this Court, by order dated January 10, 1991, the debtor commissioned an appraisal of the hospital. As of January 31, 1991, the hospital and equipment had an appraised market value of $6,700,000, an alternative use value of $6,800,000, an orderly liquidation value of

---

**4.** This figure is derived using the financial reports for August through November of 1992, which evidences the debtor's current financial status (Debtor's Exhibit 11). Total patient days for that period were 3702; of this, 2637 days were generated by the Psychiatric Care Unit.

**5.** During the hearing, the debtor offered into evidence (Debtor's Exhibit 12) a series of projected financial statements for the first five years after confirmation of the plan. According to these projections, the hospital will generate a contribution margin of:

1.) $1,078,000 for the first year,
2.) $1,652,000 for the second year,
3.) $2,836,000 for the third year,
4.) $3,015,000 for the fourth year, and
5.) $3,380,000 for the fifth year.

$5,750,000, and a forced liquidation value of $3,850,000.

The initial Disclosure Statement and Plan were filed by the debtor on August 7, 1992, and amended on September 21, 1992, and again on October 22, 1992. The Second Amended Disclosure Statement was approved by order of this Court dated October 23, 1992, and a confirmation hearing was scheduled for December 4, 1992.

Two creditors filed objections to confirmation of the plan. The first was filed on behalf of the Secretary of Health and Human Services and was resolved prior to the hearing. The second objection was filed on behalf of HUD on the grounds that the plan does not meet the requirements of 11 U.S.C. section 1129(a) & (b).[6] HUD specifically alleges that:

a.) the amended plan violates the absolute priority rule in that HUD, a class VII creditor, will not be paid in full while a junior class of creditors (class VIII) will retain control of the reorganized debtor without contributing new value;

b.) the amended plan provides for disparate treatment of unsecured creditors, with no valid reason, through a bifurcation of the unsecured creditors into two classes (class VI and class VII) based upon the dollar value of the creditor's claim;

c.) since the plan violates the absolute priority rule and treats unsecured creditors disparately, the plan is neither fair nor equitable; and

d.) the plan is likely to be followed by either liquidation or further reorganization.

During a conference with the Court on December 11, 1992, HUD also suggested that the debtor is currently in violation of the requirements of 24 C.F.R. section 242, which governs the issuance of the HUD loan guarantee. Under 24 C.F.R. section 242.1, a "hospital" is defined as

a facility ... [w]here not more than 50 percent of the total patient days during any year are customarily assignable to

the categories of chronic convalescent and rest, drug and alcoholic, epileptic, mentally deficient, mental, nervous and mental, and tuberculosis.[7]

The debtor currently accounts for approximately 71% of its patient days through the Psychiatric Care Unit. This figure in time might place the debtor in default of the HUD guarantee. Certainly exceeding 50% at any one time does not trip in default. Too, the issue of what constitutes default is not before the Court.

HUD holds a claim against the debtor in the amount of $18,025,507.35. This claim is derived from the issuance of the Peninsula Ports Authority of Virginia Hospital Revenue and Refunding Bonds, 1987 series. These bonds were issued to provide for improvements to the facility and to refund the original tax-exempt bonds issued in 1983 for the acquisition and construction of the hospital. The refunding bonds were secured by a Deed of Trust and note in the amount of $14,400,000. HUD was the guarantor on the note.

Crestar Bank is the Bond Trustee under an indenture of trust relating to the authorization and issuance of the refunding bonds. When Whittaker defaulted, the Bond Trustee filed a claim against the debtor in the amount of $18,025,507.35 which represents the unpaid principal and interest along with attorneys fees, costs and other expenses allowed under the agreement. In addition, the Bond Trustee filed a claim against HUD in its capacity as guarantor of the deed of trust note. HUD paid the claim of the Bond Trustee and became successor in interest to the claim of the Bond Trustee against the debtor in the amount of $18,025,507.35.

The issue before the Court is whether the plan has met the requirements of 11 U.S.C. section 1129, and should, therefore, be confirmed over the objections of HUD.

---

6. Although the Objection filed by HUD did not set forth any specific code sections, the language of the document would seem to suggest that HUD believes sections 1129(a)(10), (a)(11), (b)(1) & (b)(2)(B)(ii) to be at issue.

7. 24 C.F.R. 242.1.

*Conclusions*

■ 1) The proposed plan does not violate the "absolute priority rule." This Court finds the rule valid in this jurisdiction. Its purpose is to ensure "that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any *property* [under a reorganization] plan." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988), emphasis added, quoting *Norwest Bank Worthington v. Ahlers,* 794 F.2d 388, 401 (8th Cir.1986); *see also In re Bryson Properties XVIII,* 961 F.2d 496, 503 (4th Cir.1992), *cert. denied* — U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). The absolute priority rule springs from the requirement that a plan must be "fair and equitable" before it can be confirmed over the objections of dissenting creditors. *Norwest Bank Worthington,* 485 U.S. at 202, 108 S.Ct. at 966; *Bryson,* 961 F.2d at 503. The rule is codified in 11 U.S.C. section 1129(b)(2)(B), which provides:

> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of [the dissenting class] will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. section 1129(b)(2)(B).

The present group retaining control over the debtor entity does not give them anything, certainly not a favored position over HUD. It gives them problems and great anguish ahead. Too, HUD will receive far more under the plan than it would at its present liquidating value of $3,850,000. Clearly, there is no distribution to this group and nothing beyond control that passes to it. Being a Virginia nonstock corporation places it in a unique status apart from private enterprise. Code of Virginia section 13.1–801—13.1–944 [1950].

■ 2) Where the purpose is not devious, it is not fatal to bifurcate even unsecured creditors into classes. *See Matter of Jersey City Medical Center,* 817 F.2d 1055, 1061 (3rd Cir.1987), holding that similar claims may be grouped into different classes so long as the classification is "reasonable;" *Matter of LeBlanc,* 622 F.2d 872, 879 (5th Cir.1980), *reh'g denied,* 627 F.2d 239 (5th Cir.1980), separation of similar claims into different classes permissible if classification is not "arbitrary;" *In re Planes, Inc.,* 48 B.R. 698, 701 (Bankr. N.D.Ga.1985), separate classification permitted where reasonable business or economic justification exists. This approach certainly does not prejudice HUD as it is being dealt with under section 1129 on its own merit.

■ 3) The plan is fair and equitable to creditors. A single creditor is objecting and its particular complaints addressed. If other grounds such as feasibility and the liquidation test derail, so be it, but it has not been shown the plan is unfair or inequitable.

■ 4) Will HUD receive more in a liquidation than under the plan? Absolutely not. HUD has a secured claim of $4,000,-000.00. Its unsecured claim of $14,025,-507.35 will provide $960,747.22. The forced liquidation figure is put at $3,850,000.00.

5) Is it likely liquidation or further reorganization will follow? Is the debtor's plan feasible?

■ It is not a blanket guarantee which is required, but rather a reasonable likelihood of success. The debtor's evidence on this was generally uncontradicted by HUD's evidence. HUD relied on cross examination and the testimony of Frank Harrelson, Loan Officer, who spoke of (a) the hospital never being successful and (b) that under the law applicable it must remain an acute care facility, to-wit: it could not become a psychiatric facility.

The evidence obtains that (1) the plan's projections are conservative; (2) costs have been significantly cut; (3) a strong additional source of revenue has been realized,

the psychiatric therapy rehabilitation department; the profit picture turned the corner in August 1992; and greater community support is developing.

Against HUD's position espoused by one witness, we have Dr. Bower's testimony as Chairman of the Board of Trustees. While obviously an in-house interest, it was analytical. Too, Steven Dick, President of Amerihealth Co., which manages such facilities, testified that in his opinion the debtor would survive under the plan. The hospital's current management company, yes, but its reputation ultimately in the industry is based on its track record. Laura Bryant, Program Director for the Psychiatric Department, testified that the 12 beds in the unit rapidly filled. Charles Hall, Executive Director of the Hampton–Newport News Community Board, testified that Newport News General had an excellent reputation already in the psychiatric area. Robert Sherrill, Administrator of Newport News General, was a particularly excellent witness. He testified clearly of the $4,800,-000.00 in increased revenue and that the $22,000.00 needed monthly to service HUD would be available.

The Court, independently, believes that the evidence shows the plan is feasible.

Looking for any possible holes in the plan rather than building its own evidence, HUD criticizes the progress the Hospital has made in developing the psychiatric unit saying it, the hospital, must remain an acute care facility. Well, it is; no evidence to the contrary. What the future brings, it brings. The hospital obviously must protect its accreditation and abide by rules and regulations. There was no commitment from the hospital that it was going to become entirely a psychiatric hospital. This emphasis at present merely increases revenue. If it decides in the future to completely alter its purpose, it must successfully encounter the requirements at that time.

The plan is confirmed.

### More Than Dictum

The Court has confirmed the bankruptcy reorganization plan of Newport News General Hospital. Something else needs to be said.

Not that it doesn't, but the debtor must give priority, next to the care of its patients, to the position of HUD. It is not an alien or enemy creditor. HUD is financing all of this and the debtor must be dedicated and determined that for HUD's sake the plan is successfully consummated.

Too, Newport News General has for these bankruptcy purposes corralled a great deal of support. Where were they before and where will they be now? All who claim to support Newport News General must give it more than lip service—the minority it chiefly serves, physicians, churches, the government and the public. While where one goes to be hospitalized is in the final choice a personal one, the Hospital must have patients. If, if everything else is equal, the people who want it must support it. Physicians have a degree of control and, consequently, a clear calling.

It's one thing to run to the Courthouse with a show of support; it's another to actively support Newport News General for the next 30 years.

Counsel for the debtor will prepare a proposed order of confirmation.