In re CORCORAN HOSPITAL
DISTRICT, Debtor.

Bankruptcy No. 96–15051–A–9F.

United States Bankruptcy Court,
E.D. California,
Fresno Division.

April 29, 1999.

Salvatore A. Barbatano, Christopher M. Cahill,. Foley & Lardner, Chicago, Illinois, for Debtor.

Rene Lastreto, Justin Harris, Dowling, Aaron, & Keeler, Fresno, California, for Committee of Unsecured Creditors.

Leonard Herr, Dooley & Herr, Visalia, California, for Dr. David Lark.

Irene Tamura, Deputy Attorney General, Sacramento, California, for California Office of Statewide Health Planning and Development.

Virginia A. Housum, Dorsey & Whitney, Denver, Colorado, for U.S. Bank Trust.

## MEMORANDUM DECISION REGARDING CONFIRMATION OF SECOND AMENDED PLAN OF ADJUSTMENT

WHITNEY RIMEL, Bankruptcy Judge.

A hearing was held on March 3, 1999, on confirmation of the debtor's Second Amended Plan of Adjustment (the "Plan"). Salvatore Barbatano and Christopher Cahill appeared on behalf of the debtor; Rene Lastreto and Justin Harris appeared on behalf of the Committee of Unsecured Creditors (the "Committee"); Leonard Herr appeared on behalf of Dr. David Lark; Irene Tamura, Deputy Attorney General, appeared on behalf of the California Office of Statewide Health Planning and Development, Cal Mortgage Loan Insurance Division; and Virginia Housum appeared on behalf of U.S. Bank Trust, National Association. Witnesses Rod Vierra, Don Pauley, and David Greene testified on behalf of the debtor. Although creditor Starcare International, Inc. had

filed an opposition to confirmation, there was no appearance on behalf of Starcare at the confirmation hearing.

The Committee submitted the declaration of Justin Harris in support of its objections to confirmation, attaching as exhibits copies of interrogatories served by the Committee on the debtor and the debtor's responses thereto.

The debtor filed its Second Amended Ballot Report and a brief in support of confirmation, and the Committee filed a brief in opposition to confirmation.

This court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L). This memorandum decision contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

*Voting on the Plan.*

The classes of claims designated by the Plan voted as follows. Class 3 (Department of Health Services or "DHS") accepted the plan. Class 4 (allowed convenience claims of $500 or less) voted to accept the plan. Class 5 consists of allowed unsecured claims. Eight creditors in that class cast ballots. Five creditors holding claims, in the aggregate, of $36,398.87, voted to accept the Plan, while three creditors, holding claims in the aggregate of $593,575.67, voted to reject the Plan. Class 6 is Corcoran Community Medical Group, Inc. ("CCMG"). CCMG did not cast a ballot. The plan treats CCMG pursuant to the terms of a settlement agreement (the "Settlement Agreement") approved by the court between the debtor and CCMG and pursuant to which CCMG agreed to support a Plan incorporating the terms of the Settlement Agreement. Class 7 is the Office of Statewide Health Planning and Development ("Cal Mortgage"). Class 7 holds a claim of $1,301,219. It voted to accept the Plan.

Class 1 is administrative claims and is a non-voting class. Class 2 consists of the allowed claims of U.S. Bank, the "Trustee" under the Trust Agreement defined in the Plan as the Indenture dated as of July 1, 1992 between the debtor and the Trustee. The Class 7 claim arises because the debtor's obligations to the Trustee are guaranteed by Cal Mortgage. The Trustee did not vote. Class 2 is impaired under the plan.

Corcoran Hospital District (the "District") is a local hospital district in Corcoran, California. It operates a 32 bed acute care facility and an emergency room. It is governed by a board of directors elected by the voters of the District and employs over 80 people. Its primary source of income is payment for services, and the vast majority of its patients are covered by state or federal health insurance—MediCal and MediCare. The debtor also receives revenue from tax assessments. Two and three tenths percent (2.3%) of the debtor's total revenue, or about $200,000, is from tax assessments.

Payments to creditors under the Plan will be made from tax assessments (used first to pay the claims of the Trustee), lease payments, and operating revenues.

*The Committee's objections.*

The Committee objects to confirmation for three reasons. The Committee believes the Plan violates Bankruptcy Code § 1129(a)(3) requiring that a plan be proposed in good faith and not by any means forbidden by law.[1] The Committee argues that under state law, the debtor is required to raise taxes in order to pay its debts and that the debtor is unwilling to maximize its taxing power to pay its debts. Second, the Committee asserts that the Plan unfairly discriminates among unsecured creditors because DHS is paid 10% of its claim over a 7 year period while Class 5 unsecured creditors receive only 50% of their claims over a 15 year period. Third, the Committee says that the Plan

---

1. Section 1129(a)(3) applies to cases under Chapter 9. 11 U.S.C. § 901(a).

unfairly discriminates among unsecured creditors because CCMG receives, pursuant to the Settlement Agreement between CCMG and the debtor, 80% of its 50% claim over 5 years while Class 5 receives its 50% distribution over 15 years. As further evidence of unfair discrimination, the Committee asserts that the Settlement Agreement between the debtor and CCMG requires that if the DHS recoupment or set-off claim exceeds $200,000, unsecured creditors cannot receive greater than 20% of their 50% claim until CCMG is paid all distributions under the Settlement Agreement. Finally, the Committee asserts that the Plan should not be confirmed because it violates the provisions of § 1129(b)(2)(B).[2]

*General requirements of confirmation.*

The debtor has satisfied its burden of proof with respect to confirmation of the Plan. Bankruptcy Code § 943(b) provides that the court shall confirm a plan under Chapter 9 if the requirements of § 943(b) are met. These requirements are:

"(b) The court shall confirm the plan if—

(1) the plan complies with the provisions of this title made applicable by sections 103(e) and 901 of this title;

(2) the plan complies with the provisions of this chapter;

(3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable;

(4) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

(5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in section 507(a)(1) of this title will receive on account of such claim cash equal to the allowed amount of such claim;

(6) any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and

(7) the plan is in the best interests of creditors and is feasible."

Section 943(b) incorporates a number of the provisions of Chapter 11 applicable to plans under Chapter 11. There is no dispute that the requirements of subsections (2) through (6) are satisfied. The Committee's objections raise the issue of whether subsections (1) and (7) have been satisfied. This memorandum will first address those requirements of confirmation that were not in substantial controversy and then address the issues raised by the Committee.

The Plan contains provisions permitted by § 1123(b). It provides for the assumption of all unexpired executory contracts not previously rejected.

The debtor obtained court approval of its disclosure statement, and its solicitation of ballots for the acceptance or rejection of its Plan complied with § 1125 of the Bankruptcy Code. Further, the debtor has complied with the applicable provisions of the Bankruptcy Code as required by § 1129(a)(2) in that it has complied with § 1125.

Section 943(b)(3) requires that all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan be fully disclosed and be reasonable. The debtor has agreed that "after confirmation, the Debtor will seek to pay its attorneys and Committee counsel compensation and reimbursement in an amount and on a schedule to be approved by the Court. The Debtor will not make any final payments to either counsel without a finding from the Court that such a payment is reasonable; there-

---

**2.** Section 1129(b)(2)(B) is made applicable to cases under Chapter 9. 11 U.S.C. § 901(a).

fore it is unnecessary to make a finding of reasonableness at this time."[3] Thus, this requirement of § 943(b)(3) is met, provided that the order confirming the Plan shall contain language consistent with the debtor's representation.

*The Plan is feasible and in the best interests of creditors.*

Three witnesses testified on behalf of the debtor. Rod Vierra, the chief financial officer of the District, testified that he has served as controller and chief financial officer since January 1994. He testified about the negotiations between the debtor and DHS and between the debtor and CCMG. He also testified that he believes the Plan is feasible based on the hospital's projections for income and expenses. He described the amount of the hospital's budget that comes from tax assessment revenues and how the payments to creditors in the plan were determined. He testified that the hospital has become more operationally efficient. He testified about the past unsuccessful attempt to increase tax assessments for the hospital.

Don Pauley, the city manager of the city of Corcoran, testified that he has been the city manager for eight and one-half years. He has served as department head or chief administrative officer in five different cities over the last 22 and one-half years. Mr. Pauley testified about the demographics of the city of Corcoran and about the methods by which tax assessments are imposed. He testified about economic issues facing the city of Corcoran and the surrounding region.

David Green, the chief executive officer of the District, testified. Mr. Green has an MBA in health services administration from Golden Gate University and is a certified health care executive accredited by the American College of Health Care Executives. He has worked in the health care field for over 25 years. He testified about the efforts he has made to improve cash flow at the hospital, about the quality

of service at the hospital, about the hospital's strategic plan, and stated that he believes the hospital will be able to meet its commitments to the creditors in its plan of reorganization.

The plan is based on projections that the debtor formulated based on reasonably anticipated income and expenses. MediCare and MediCal payments comprise probably 60 to 70% of the hospital's revenues and for that reason, it is important that the hospital have a good relationship with the State of California Medicaid Reimbursement Program. The Hospital District negotiated with the State of California Department of Health Services ("DHS") to reduce the claim of DHS. The negotiations resulted in a claim for overpayments being reduced from $5 to $6 million to the agreed on $1.5 million claim. The settlement with DHS contemplates the DHS agreed claim being paid 10% over 7 years after confirmation. No payments will be made for the first 12 months following confirmation.

In negotiations with CCMG, the debtor reached a Settlement Agreement earlier approved by the court. That agreement reduces a proof of claim filed by CCMG in the amount of $2,751,388.89 to an allowed unsecured claim of $1,317,057. Under the Settlement Agreement, various credits and voluntary reductions were applied to that claim, for a new net allowed general unsecured claim of $725,000. Under the Settlement Agreement, CCMG gives up any administrative claim. The Settlement Agreement provides that CCMG's allowed net general unsecured claim of $725,000 will be paid pro rata with all other general unsecured claims; CCMG will receive 50% of its net allowed unsecured claim over a period not to exceed 15 years from the effective date of the settlement. Of that 50% distribution, not less than 40% shall be paid within 5 years of the effective date; an additional 30% within 10 years of the effective date; and the remaining 30%

**3.** Brief in Support of Confirmation of Second    Amended Plan of Adjustment, p. 18.

by the end of the 15th year after the effective date without interest.

The settlement with CCMG and the settlement with DHS made it possible for the debtor to propose and go forward with the present Plan.

The Plan contemplates paying Class 5 general unsecured creditors 50% of their allowed claims over 15 years. This 50% payment will be paid at least 20% within 5 years after the effective date; an additional 15% within 10 years after the effective date; and the remaining 15% within 15 years after the effective date.

The District receives approximately $200,000 per year from tax assessment revenues. Under the Plan, those payments will be used to make annual payments to unsecured creditors and the principal payments required for the Trustee (Class 2). Interest payments for the Trustee will be paid from property taxes, from rental income, and from operations.

The District has made operational changes that Mr. Vierra believes will result in reduction in variable operating expenses by approximately 20% per fiscal year. It has employed a professional management company. The District has improved the speed with which it collects accounts receivable. The District has recruited a new physician to set up his practice in Corcoran.

At the same time, the District relies primarily on reimbursement from government programs and has no private donation or foundation funds available. The hospital building is dated.

As of January 31, 1999, unemployment in the city of Corcoran was 17.3% according to data from the California Employment Development Department. Based on the 1990 census, the median per capita income for a resident in the city of Corcoran was 50% of the state's median per capita income. In a ranking by the U.S. Census Bureau in each state, based upon factors such as per capita income and median family income, Corcoran is the 5th poorest community in the state as of the 1990 census. In at least the last 8 years, there have been no successful efforts to raise property taxes within the city of Corcoran. There has been only one formal effort to raise property taxes, and that was a previous effort by the District to raise taxes to support an emergency room. That effort failed. Although it received a majority vote, it did not receive the two-thirds majority required.

The District is larger than the city of Corcoran. Outside the city, the District is primarily farmland. Mr. Pauley testified that large farm owners have confronted economic downturn in the last five years. In the city of Corcoran itself, there appears, according to Mr. Pauley, to be a decline in total residents. Mr. Pauley testified that it was unlikely that a referendum to raise property taxes for the hospital district would receive even 50% of the voters' support.

The hospital is very important to the community of Corcoran. According to Mr. Pauley, the residents of Corcoran see Corcoran District Hospital as an essential element to the survival of Corcoran as a community.

Based on the testimony at the confirmation hearing, the plan of adjustment is feasible and in the best interests of creditors and thus satisfies the requirements of Bankruptcy Code § 943(b)(7).

*The Plan's classification of the Class 5 general unsecured creditors separately from CCMG and DHS is justified.*

Bankruptcy Code § 1122 is made applicable to Chapter 9 by § 901(a), as are § 1123(a)(1), (2), (3), (4), (5), and § 1123(b). Here, the Committee has objected to plan confirmation on the grounds that the claim of DHS is receiving better treatment than the claims of the general unsecured creditors and that the claim of CCMG is receiving better treatment as well.

In order to address the issue of disparate treatment coherently, it is first necessary to address the issue of the separate

classification of the general unsecured creditors from DHS and from CCMG. Section 1122(a) states that except for administrative convenience classes dealt with in § 1122(b), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." The bankruptcy court's determination that a claim is or is not substantially similar to other claims is a question of fact. *In re Johnston,* 21 F.3d 323, 327 (9th Cir.1994). In that case, the bankruptcy court had allowed separate classification because Steelcase held a security interest in the assets of a co-debtor; its claim was currently being litigated; and if it were successful in the litigation, it could be paid fully before other unsecured creditors. The Court of Appeals held that separate classification did not violate § 1122(a) because the legal character of Steelcase's claim was not substantially similar to the other claims or interests of the unsecured creditors. *Id.* at 328.

Issues about classification under § 1122(a) and treatment of classes under § 1123(a) must be viewed in light of § 1129(b)(1),[4] which among other things, prohibits unfair discrimination and requires a plan to be fair and equitable with respect to impaired non-accepting classes. *Id.* The appellate court held that the *Johnston* plan satisfied that requirement because "there were reasonable, nondiscriminatory reasons for" the separate classification. *Id.*

■ In short, there must be a business or economic justification for separate classification of unsecured claims. *In re Tucson Self–Storage, Inc.,* 166 B.R. 892, 898 (9th Cir. BAP 1994); *In re Baldwin Park Towne Center, Ltd.,* 171 B.R. 374, 376 (Bankr.C.D.Cal.1994). Thus, while § 1122 on its face does not require that similar claims be classified together, within the Ninth Circuit, separate classification of unsecured claims will require a business or economic justification. That justification cannot consist solely of the debtor's wish to obtain a consenting impaired class of creditors voting in favor of its plan. *Id.*

■ Finally, in determining whether a separate classification under § 1122(a) and, similarly, treatment of separate classes under § 1123(a)(1) through (4) is appropriate, courts must be guided by the mandate of § 1129(b)(1) that the plan not discriminate unfairly with respect to a class of creditors that is impaired under the plan and has not voted to accept the plan.

■ Here, there are business and economic justifications for classifying the general unsecured creditors separately from DHS. At the confirmation hearing, the Committee acknowledged that DHS has a right of recoupment against the debtor. Because of this right of recoupment, DHS has different rights from the Class 5 general unsecured creditors. Thus, without more, classifying the claims of DHS separately is permissible. Second, however, the debtor entered into a settlement with DHS which significantly reduced DHS's claims and under which DHS is paid 10% of its reduced allowed claim over 7 years from the effective date, with all payments to be deferred for the first year after the effective date.

■ Similarly, there is a business and economic justification for the separate classification of the claim of CCMG from that of the Class 5 unsecured creditors. The debtor and CCMG were engaged in litigation. The Settlement Agreement between the debtor and CCMG allowed the debtor to proceed to propose a Plan to adjust its debts. The settlement reduced a claim from over $2.7 million to a net allowed general unsecured claim of $725,000 with no administrative claim or rights of setoff. The CCMG settlement with the debtor was approved by the boards of directors of CCMG and the debtor, as well as by this court. The Committee was

---

4. Made applicable to cases under Chapter 9   by § 901(a).

given notice of the motion to approve the settlement and did not oppose it. The recitals to the Settlement Agreement state that the paramount reasons for the parties' agreeing to resolve "their differences is to ensure that the citizens in Corcoran Hospital District continue to have access to medical services and that the parties desire to reduce or eliminate the costs and expenses attendant to their disputes. For these reasons, CCMG voluntarily agrees to reduce the amounts of its claims and to a stretched out, long term payment on its claims, as it strongly desires to see CHD be able to continue in existence."[5]

Absent the Settlement Agreement with CCMG, the court finds it unlikely that the debtor could have proposed this Plan. The testimony of the debtor's chief financial officer was that the debtor's projections will allow it to complete the payments under the Plan. The debtor is devoting its resources to maintaining its hospital operations and to making the payments under the Plan. If the debtor were forced to expend resources in continued litigation with CCMG or in simply paying the originally filed claim of CCMG, it most likely would not have been able to propose a feasible, confirmable Plan. Under these circumstances, there are business and economic justifications for separately classifying CCMG from the unsecured creditors.

The Third Circuit Court of Appeals addressed a similar issue in a Chapter 9 case, also involving a public hospital. *In the Matter of Jersey City Medical Center, Inc.*, 817 F.2d 1055 (3rd Cir.1987). In that case, the debtor's plan divided unsecured creditors into four separate classes. Class 2 creditors were doctors with claims arising out of agreements with the debtor for indemnity against medical malpractice awards. Class 2 creditors were to receive 100% of their claims under the plan. Class 3 creditors were holders of pre-petition medical malpractice claims against the debtor. They were to receive 30% of their allowed claims. Class 4 creditors were employee benefit plan non-priority claims, and Class 5 creditors were general unsecured creditors. Classes 4 and 5 were each to receive 30% of their claims under the plan, along with pro rata shares from a surplus fund and a pool of excess revenues. *Id.* at 1057. Classes 3 and 4 rejected the plan, and Class 5 accepted it. The bankruptcy court confirmed the plan, and the district court affirmed. On appeal by one general unsecured creditor, apparently a member of Class 5, the Third Circuit Court of Appeals affirmed.

The appellant argued, among other things, that the plan unfairly discriminated among general unsecured creditors. The Court of Appeals noted that nothing in the Code precluded the debtor from "variously classifying the unsecured claims here." *Id.* at 1060. The court opined that "it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case ... Accordingly, we agree with the general view which permits the grouping of similar claims in different classes." *Id.* at 1060–1061.[6] The Third Circuit Court of Appeals recognized that classification must be reasonable. *Jersey City Medical Center, supra,* at 1061. In the *Jersey City Medical Center* case, the Third Circuit Court of Appeals pointed out that it was reasonable to distinguish among the claims of physicians, medical malpractice victims, employee benefit participants, and trade creditors. Similarly, here it was reasonable to distinguish general unsecured creditors from DHS on the one hand and CCMG on the other hand.

The Committee bases its argument about being treated less well than DHS and CCMG on § 1123(a)(4). That section requires that a plan provide the same

---

**5.** Recital K to Settlement Agreement, of which the court takes judicial notice.

**6.** See also, *In re Johnston, supra,* at 327–328. ("We are also satisfied that bankruptcy court judges must have discretionary power in classifying claims under § 1122(a))". *Id.* at 327.

treatment "for each claim or interest of a particular class." Here, of course, the Plan has placed the claims of unsecured creditors in a separate class from DHS and CCMG. Thus, the discussion more appropriately focuses on whether the classification was permissible under § 1122 and on whether there is unfair discrimination under § 1129(b)(1). Section 1123(a)(4) "only requires equality of treatment of 'claims' or 'interests' placed in the same class." *In re Acequia, Inc.*, 787 F.2d 1352, 1363 (9th Cir.1986).

*The Plan does not discriminate unfairly as to Class 2 or Class 5.*

Section 1129(b)(1) requires that if a class of impaired creditors fails to accept the plan, the plan may not be confirmed unless it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." Here, a class of unsecured claims voted against the Plan and the class consisting of the Trustee failed to vote.

■ The Plan does not discriminate unfairly as to either the unsecured creditors or the Trustee. While it is true that the Plan treats the general unsecured creditors differently from CCMG, from the administrative convenience creditors, and from DHS, that different treatment does not constitute unfair discrimination. Section 1122(a)(2) allows a plan to create a separate classification for administrative convenience creditors. Such separate classification does not constitute unfair discrimination. Nor, here, does the fact that CCMG will be paid its 50% payout at a somewhat faster rate than general unsecured creditors constitute unfair discrimination. As described above, CCMG compromised its claim significantly. Given the magnitude of CCMG's compromise in the Settlement Agreement, the court is unable to say that the disparate treatment of CCMG from the other unsecured creditors constitutes unfair discrimination.

■ Similarly, the Plan does not discriminate unfairly against the Trustee. Class 2 will be paid in full over an extended time, and retains its rights against the debtor. The Plan does not discriminate unfairly with respect to Class 2. Further, the court notes that Class 2 did not object to plan confirmation, and that Cal Mortgage, which guarantees the payments to the Trustee, voted to accept the Plan.

*The Plan is fair and equitable as to the Trustee.*

As to Class 2, § 1129(b)(2)(A) requires, in this context, that in order to be fair and equitable, a plan must provide that the holders of secured claims retain their liens and receive on account of their claims deferred cash payments totaling at least the allowed amount of their claims, with a value as of the effective date of the plan of at least the value of their interest in the estate's interest in the property securing their claims, or the realization of the indubitable equivalent of their claims.

That requirement is met here. The Trustee will receive all payments on a deferred basis, and will receive interest at the rate and in the amount required under the Trust Agreement. The Trust Agreement will remain in full force and effect as will all bonds and other instruments authorized by and executed or issued in connection with the Trust Agreement. The liens of Class 2 will continue to exist until the debtor's obligations to the Class 2 claim holder has been satisfied in full. Thus, the Plan is fair and equitable as to the Class 2 creditor.

*The Plan is fair and equitable as to the Class 5 general unsecured creditors.*

Bankruptcy Code § 1129(b)(2)(B) sets out two alternatives for a plan to be fair and equitable with respect to a dissenting class of unsecured creditors. First, the plan can provide that each claim holder in that class receive or retain property equal to the allowed amount of his claim. Alternatively, the plan can provide that no holder of any claim or interest that is junior to

the claims of dissenting class receive or retain any property on account of such junior claim or interest.

■ In the typical Chapter 11 case, this requirement means that equity holders may not retain their interest unless the unsecured class either accepts the plan or is paid in full. In a reorganization of a municipality under Chapter 9 or of a non-profit corporation under Chapter 11, the requirement must be interpreted somewhat differently. As the debtor has pointed out, there are no holders of equity interests in the debtor here. Thus, what is commonly referred to as the "absolute priority rule" embodied by § 1129(b)(2)(B) does not prevent the debtor here from continuing to operate the hospital.

In *In re General Teamsters, Local 890*, 225 B.R. 719 (Bankr.N.D.Cal.1998), the court considered the Chapter 11 reorganization plan of a labor union. The labor union was a non-profit entity. In that case, the objecting creditors argued that the absolute priority rule had not been met because the "Debtor will continue in existence and in possession of its property, even though Creditor and other unsecured creditors will not be paid in full." *Id.* at 735. The court held that "the Absolute Priority Rule does not provide that a debtor entity may not receive or retain property unless all creditors have been paid in full...." *Id.* at 735–736. The court held that an "interest" is that which is held by an "equity security holder." The Bankruptcy Code defines equity security holder in § 101(17) as the "holder of an equity security of the debtor." Section 101(16) defines "equity security" as a share in a corporation, an interest of a limited partner in a limited partnership, or a warrant or right with respect to such an interest.[7] *See also, In re Acequia, supra,* at 1363. The residents of the District have no own-ership interest in the debtor akin to that of shareholders of a corporation or partners in a partnership.

The Seventh Circuit Court of Appeals considered this issue in *Matter of Wabash Valley Power Ass'n., Inc.*, 72 F.3d 1305 (7th Cir.1995). There, the debtor was a non-profit rural electric membership cooperative association. The Court stated that the term "interest" as used in § 1129(b)(2)(B) referred to equity interests. In that case, the members of the non-profit cooperative were not, according to the Court, "owners in any usual sense of the term." *Id.* at 1313. They received no profits and had no current or prospective ownership rights in the assets of the cooperative. *Id.* The same is true of the residents of the Hospital District here. The *Wabash* Court held that the only right the members of the non-profit cooperative had equivalent to the rights of shareholders in a corporation was a right to elect members of the board of directors. Nonetheless, the Court said that "control alone, divorced from any right to share in corporate profits or assets, does not amount to an equity interest." Further, "the mere fact that the [members of the cooperative] are benefitted by Wabash's operation and might be disadvantaged by its demise also does not give them an 'interest' cognizable in bankruptcy." *Id.* at 1318. In another case involving a hospital association, the bankruptcy court held that retention of control of the hospital by those who controlled it before the bankruptcy case did not violate the absolute priority rule since "the present group retaining control over the debtor entity does not give them anything, certainly not a favored position over [the dissenting creditor]. It gives them problems and great anguish ahead.... Clearly, there is no distribution to this

7. While the definitional provisions of § 101 are not made applicable to Chapter 9 by § 901(a), § 901(b) provides that "a term used in a section of [the Bankruptcy Code] made applicable in a case under this chapter by subsection (a) of this section or section 103(e) of [the Bankruptcy Code] has the meaning defined for such term for the purpose of such applicable section, unless such term is otherwise defined in § 902 of [the Bankruptcy Code]." Section 902 does not define equity security or equity security holder.

group and nothing beyond control that passes to it." *In re Whittaker Memorial Hospital Ass'n., Inc.,* 149 B.R. 812, 816 (Bankr.E.D.Va.1993).

Here, no interest holder will receive or retain any property under the Plan. Therefore, the requirements of § 1129(b)(2)(B) have been met as to Class 5.

*The Plan satisfies the requirements of § 1129(a)(3). It has been proposed in good faith and not by any means forbidden by law.*

▮ The Committee has argued that the Plan is not proposed in good faith and is not fair and equitable because the District should be obligated to raise taxes or at least attempt to raise taxes to pay the unsecured creditors in full. There are two reasons why this argument does not succeed. First, based on the testimony at the confirmation hearing, the court finds that any further attempt to raise the Hospital District assessment taxes to pay creditors more under the Plan would be a futile exercise. Therefore, even if this were a requirement, the court would be constrained to find that the requirement has been met. Second, the court is not persuaded that this is a requirement.

One of the Committee's principal arguments is that the debtor has the obligation under California law to maximize its taxing power in order to pay its creditors. The Committee states that the debtor is required to "utilize its already existing taxing power to more fully compensate unsecured creditors, whose claims are both undisputed and liquidated." [8] According to the Committee, the debtor's unwillingness to attempt a referendum to raise taxes is inadequate as a matter of law. The Committee relies primarily on *F & L Farm Co. v. City Council of the City of Lindsay,* 65 Cal.App.4th 1345, 77 Cal. Rptr.2d 360 (1998).

In that case, the California Fifth District Court of Appeal addressed an issue that arose when three farm owners recovered judgments against the city on an inverse condemnation theory for losses caused by the city's pollution of the groundwater. The City argued that while it recognized its liability under the judgments, it was impossible to generate income to pay the judgments and therefore a peremptory writ of mandate to compel payment of the judgments could not issue. According to the City, under the state constitution, it lacked the authority to impose taxes sufficient to pay the judgment. The Court of Appeals noted that "despite the constitutional debt limitation, the courts held from an early date that involuntary obligations of the local government entity were not affected by the constitutional limitation." *Id.* at 1351, 77 Cal.Rptr.2d 360. Because the obligation was one imposed by law, the City had to pay the judgment. In arguing that the debtor is required by California law to raise taxes to pay the claims of the unsecured creditors, the Committee asserts that the claims of the unsecured creditors are equivalent to judgments. The Ninth Circuit Court of Appeals has recently determined that proofs of claim are not equivalent to judgments. *In re Southern California Plastics, Inc.,* 165 F.3d 1243, 1248 (9th Cir.1999).

The Committee thus argues that California law requires a municipality to pay its debts by levying a tax. Further, the Committee says that the Bankruptcy Code does not alter this requirement. The Committee relies on § 903 of the Bankruptcy Code, and a comment from *Collier,*

> "The effect of § 903 is to remove any inference that the legislation accomplishes anything more than to provide a procedure under which municipalities may adjust their indebtedness. Nothing in chapter 9 indicates Congressional attempt to interfere with a state's control over its municipalities."

Lawrence P. King, *Collier Pamphlet edition Bankruptcy Code* § 903 (1998).

---

8. Creditor Committee's Objections to Debtor's Second Amended Plan of Adjustment, Page 6.

A similar situation was addressed by the Montana bankruptcy court in *In re City of Columbia Falls, Montana, Special Improvement Dist. No. 25*, 143 B.R. 750 (Bankr.D.Mont.1992). In that case, the creditors objected to the plan of adjustment of the Special Improvement District. They relied, as does the Committee here, on the provisions of § 903. They argued that § 903 limits the ability of the debtor to modify its bond obligations under the plan. *Id.* at 758. The court held that "the language of 11 U.S.C. § 903 does not prevent the obligations to the bondholders from being impaired in bankruptcy. Section 903 provides Chapter 9 cannot 'impair the power of a State to control, by legislation or otherwise, a municipality.' However, no municipality may seek the protection of the federal bankruptcy laws without statutory authorization by the state." *Id.* at 759. Just as in that case the Montana statute permitted municipalities to file under Chapter 9, here the Chapter 9 filing by Corcoran Hospital District was permitted under the applicable California statute.

The Montana bankruptcy court went on to say

"Any city or town may submit itself and a proposed plan of composition to the jurisdiction of the bankruptcy court having jurisdiction of such matter and be governed by the proceedings, orders, and decrees of the court as provided by the federal municipal bankruptcy laws. [citations omitted.]

Had the Montana Legislature sought to require municipalities to pay all of their debts in full, regardless of the cost to city services, it could have merely refused to permit municipalities to file Chapter 9 petitions by not enacting the enabling legislation required by Section 109(c)(2)."

*Id.* at 759–760.

The Montana court echoed a Nebraska bankruptcy court in saying "To create a federal statute based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result." *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 974 (Bankr. D.Neb.1989), quoted in *City of Columbia Falls, etc., supra*, at 760.

The decision of the Ninth Circuit Court of Appeals in *Fano v. Newport Heights Irr. Dist.* is not inconsistent with this result. 114 F.2d 563 (9th Cir.1940). In that case, the Irrigation District was a debtor under Chapter IX. The question addressed by the Court was "At the time of filing of the petition, was the District insolvent or unable to pay its debts as they fall due, and if so, is the proposed plan fair?" *Id.* at 564.

The Court held that under the facts before it, while the Irrigation District did not have the funds fully to pay its interest payments and in that sense was insolvent, it was far from insolvent in the bankruptcy sense. Its assets exceeded its indebtedness by a large margin. The assets were in excellent physical and almost new condition. Under the particular circumstances of that case, the Ninth Circuit Court of Appeals held that it was "unable to find any reason why the tax rate should not have been increased sufficiently to meet the District's obligations or why it can be said that the plan is 'equitable' and 'fair' and for 'the best interest of the creditors' with no sufficient showing that the taxing power was inadequate to raise the taxes to pay them." *Id.* at 566.

Those are not the circumstances here. The evidence here is that the liabilities of the debtor far exceed the value of its assets. In *Fano*, the lower court had found that the Irrigation District spent substantial funds in improving the irrigation system. This expenditure meant that it had to suspend interest payments on the bonds. As a result, the value of the its assets had increased significantly. "We think the deficit has been caused by the reconstruction of the system and the diver-

sion of tax monies to the payment therefor, a sufficient part of which monies could have been allocated to the interest fund. Thus we see, it was not the disability of the District to support itself, but the payment for heavy betterments practically upon a cash basis that brought about the embarrassment." *Id.* at 565.

In contrast, *Newhouse v. Corcoran Irr. Dist.* is another case from 1940 involving an irrigation district. 114 F.2d 690 (9th Cir.1940). In that case, the Ninth Circuit Court of Appeals affirmed the district court which had approved a plan for composition of bonded indebtedness under Chapter IX of the Bankruptcy Act of 1898, holding that the irrigation district was insolvent "in the sense that it was unable to meet its debts as they fell due and that the plan proposed was fair and equitable." *Id.* at 690. The Court held that the bankruptcy of a public entity "is very different from that of a private person or concern." *Id.* at 690–691. According to the Court of Appeals, the assets and property within the district "cannot be disposed of as in the ordinary bankruptcy proceeding for the benefit of the debtor." The Court refused to require the debtor to raise more money. "The evidence does not support the theory that such a fund could have been collected by assessment for the continued operation under the original heavy load." *Id.* at 691. Thus, in these cases under Chapter IX, the Ninth Circuit Court of Appeals looked at the insolvency of the debtor and whether the debtor could, in fact, raise taxes sufficient to pay the bondholders in full. Here, the court has found that the debtor Hospital District could not raise taxes sufficient to pay more to Class 5.

Corcoran Community Hospital District's Plan was proposed in good faith and not by any means forbidden by law. It satisfies the applicable requirements of the Bankruptcy Code and will be confirmed.

Counsel for the debtor shall submit a proposed order confirming the second amended plan of adjustment. Such order shall also resolve the debtor's pending motion for approval of assumption of executory contract, consistent with confirmation of the Plan. It shall contain the requirements for compensation of counsel referenced herein.